# In the United States Court of Appeals for the First Circuit

UNITED STATES OF AMERICA

*Appellant,*

*v.*

JOVAN VAVIC,

*Defendant-Appellee.*

*On Appeal from the United States District Court for the District of Massachusetts (Criminal No. 1:19-cr-10081-IT-12) (Hon. Indira Talwani)*

## BRIEF OF DEFENDANT-APPELLEE JOVAN VAVIC

THOMAS J. O'CONNOR, JR.
 *1391 Main Street, Suite 1022*
 *Springfield, MA 01103*
 *(413) 781-5311*
 *attorneytomoconnor@gmail.com*

SARAH M. HARRIS
KATHERINE A. TREFZ
ASHWIN G. SHANDILYA
JEFFREY G. HO
WILLIAMS & CONNOLLY, LLP
 *680 Maine Avenue, S.W.*
 *Washington, DC 20024*
 *(202) 434-5000*
 *sharris@wc.com*

*Counsel for Defendant-Appellee*

# TABLE OF CONTENTS

TABLE OF CONTENTS...............................................................................i

TABLE OF AUTHORITIES .............................................................. iii

INTRODUCTION ..............................................................................1

STATEMENT OF THE ISSUES .........................................................5

STATEMENT OF THE CASE ............................................................5

    A.    The Varsity Blues Cases .................................................5

    B.    *Abdelaziz* Rejects Key Aspects of Varsity Blues
           Prosecutions.........................................................................8

    C.    The Government's Prosecution of Coach Vavic............10

    D.    The Operative Indictment.................................................15

    E.    The Government's Theories and Evidence ...................17

    F.    Recurrent Trial Issues .....................................................22

    G.    Closing Arguments and Verdict....................................24

    H.    The District Court's Grant of a New Trial....................25

SUMMARY OF ARGUMENT..........................................................28

STANDARD OF REVIEW ...............................................................34

ARGUMENT .....................................................................................35

I.    *Abdelaziz* Independently Requires Vacating the Convictions
    Because the Government Failed To Prove the Single, Sprawling
    Conspiracy Charged in the Indictment .....................................35

    A.    The Government Did Not Prove the Charged Conspiracies.......36

    B.    The Variance Was Highly Prejudicial .............................47

II.    *Abdelaziz* Requires Vacating the Honest-Services Fraud
    Conviction....................................................................................56

III.    The Government's Reliance on False Statements in Closing
    Arguments and Throughout Trial Warrants a New Trial......................62

    A.    The Government's Prolific Reliance on Singer's False
           Statements Warrants a New Trial.................................63

B.     The Government's Misrepresentations in Closing Arguments Compounded the Prejudice.........................74

IV.  The District Court Did Not Abuse Its Discretion in Holding That Prosecutors' Rebuttal Misled the Jury on the Instructions...................77

A.    The Government Contravened the Jury Instructions.................78

B.    The Government's Misstatements Were Prejudicial....................84

CONCLUSION..........................................................................................88

# TABLE OF AUTHORITIES

Page

## CASES

*Arrieta-Agressot v. United States,*
    3 F.3d 525 (1st Cir. 1993) .......................................................75

*Cameron v. Otto Bock Orthopedic Indus., Inc.,*
    43 F.3d 14 (1st Cir. 1994) ......................................................34

*Dow v. Virga,*
    729 F.3d 1041 (9th Cir. 2013) ...............................................63

*Jenkins v. Artuz,*
    294 F.3d 284 (2d Cir. 2002) ............................................63, 64

*Kotteakos v. United States,*
    328 U.S. 750 (1946) ....................................................37, 46, 47

*Napue v. Illinois,*
    360 U.S. 264 (1959) ...............................................................63

*Skilling v. United States,*
    561 U.S. 358 (2010) ...............................................................78

*Snyder v. United States,*
    No. 23-108 (U.S.) ...................................................................80

*United States v. Abdelaziz,*
    68 F.4th 1 (1st Cir. 2023) ...............................................*passim*

*United States v. Ayala-García,*
    574 F.3d 5 (1st Cir. 2009) ......................................................75

*United States v. Azubike,*
    504 F.3d 30 (1st Cir. 2007) ..............................................74, 77

*United States v. Baptiste,*
    8 F.4th 30 (1st Cir. 2021) .................................................84, 88

*United States v. Canty,*
    37 F.4th 775 (1st Cir. 2022) ..........................................*passim*

*United States v. Carpenter,*
    494 F.3d 13 (1st Cir. 2007) ..........................27, 34, 74, 84

*United States v. Chandler,*
    388 F.3d 796 (11th Cir. 2004) ..............................................43

*United States v. Colburn,*
    No. 19 Cr. 10080 (D. Mass. Jan. 14, 2020) .........................16

*United States v. Dellosantos,*
    649 F.3d 109 (1st Cir. 2011) ...........................................43, 49

Cases—cont'd:

*United States v. Demott,*
  906 F.3d 231 (2d Cir. 2018) ..............................................70
*United States v. Falcón-Nieves,*
  79 F.4th 116 (1st Cir. 2023)......................35, 39, 44, 49
*United States v. Fernandez,*
  722 F.3d 1 (1st Cir. 2013) ...............................................57
*United States v. Freeman,*
  650 F.3d 673 (7th Cir. 2011)....................................*passim*
*United States v. Fulmer,*
  108 F.3d 1486 (1st Cir. 1997) .........................................70
*United States v. Glenn,*
  828 F.2d 855 (1st Cir. 1987) .....................................43, 44
*United States v. Kaiser,*
  609 F.3d 556 (2d Cir. 2010) ............................................55
*United States v. Kilmartin,*
  944 F.3d 315 (1st Cir. 2019) ...........................................34
*United States v. LaPage,*
  231 F.3d 488 (9th Cir. 2000).........................................63
*United States v. Macklin,*
  573 F.2d 1046 (8th Cir. 1978)........................................52
*United States v. Mangual-Garcia,*
  505 F.3d 1 (1st Cir. 2007) ...............................................52
*United States v. Nieves-Burgos,*
  62 F.3d 431 (1st Cir. 1995) .............................................57
*United States v. Perez Soto,*
  80 F.4th 50 (1st Cir. 2023)..............................................76
*United States v. Pérez-Vásquez,*
  6 F.4th 180 (1st Cir. 2021)..............................................53
*United States v. Petrozziello,*
  548 F.2d 20 (1st Cir. 1977) ......................................*passim*
*United States v. Pires,*
  642 F.3d 1 (1st Cir. 2011) ...............................................77
*United States v. Robles,*
  45 F.3d 1 (1st Cir. 1995) .................................................34

Cases—cont'd:

*United States v. Sandoval,*
  6 F.4th 63 (1st Cir. 2021)................................................................77
*United States v. Sawyer,*
  85 F.3d 713 (1st Cir. 1996) ......................................................57, 61
*United States v. Stacks,*
  821 F.3d 1038 (8th Cir. 2016)........................................................64
*United States v. Stephenson,*
  53 F.3d 836 (7th Cir. 1995)............................................................52
*United States v. Vega,*
  813 F.3d 386 (1st Cir. 2016) ..........................................................63
*United States v. Velazquez,*
  1 F.4th 1132 (9th Cir. 2021) ..........................................................78
*United States v. Vozzella,*
  124 F.3d 389 (2d Cir. 1997) ....................................................63, 64
*United States v. Zangrillo,*
  No. 19 Cr. 10080-19 (D. Mass. Mar. 3, 2020) ...............................14

## STATUTES, REGULATIONS, AND RULES

Racketeer Influenced and Corrupt Organizations Act (RICO).............6, 12, 16
18 U.S.C. § 371 ..............................................................................................17
18 U.S.C. § 666 ...........................................................................8, 17, 78, 80
18 U.S.C. § 1341 ..............................................................................................8
18 U.S.C. § 1343 ..............................................................................................8
18 U.S.C. § 1346 ..........................................................................4, 8, 16, 78
Federal Rule of Criminal Procedure 29.................................................27, 85
Federal Rule of Criminal Procedure 33 .....................................................25
Federal Rule of Evidence 403 .............................................................54, 63

## OTHER AUTHORITIES

Daniel Libit, *Varsity Blues Affair Winds Down as Ex-USC Official
  Now Free,* Sportico, July 12, 2023...............................................27
J. Brady McCullough, *USC Fires Administrator and Coach Arrested
  in College Admissions Fraud Scheme,* L.A. Times, Mar. 12, 2019............15

Other Authorities—cont'd:

*Jovan Vavic*, USC Men's Water Polo, https://tinyurl.com/45ajurmf ..............28

3 Charles Alan Wright, Nancy J. King & Susan Klein, *Federal Practice and Procedure* § 588 (5th ed. 2019) ..............................................................74

**INTRODUCTION**

Rick Singer—the superstar college-admissions consultant and con man at the heart of the Varsity Blues prosecutions—was a prolific liar. He lied that he obtained 760 college admissions per year at nearly every university through the "side door"—whereby he helped wealthy students gain admission to colleges as athletic recruits and their parents donated to the schools. JA5.563-65. He lied to parents about how he operated. JA5.614-15, 618. He lied to coaches about students' credentials, falsifying GPAs and athletic accolades before coaches saw resumes. JA4.121; JA5.528-32. And he lied to lower-profile coaches to entice them to keep accepting cash bribes, falsely boasting that Duke's Coach Mike Krzyzewski and the University of Southern California's Pete Carroll gave Singer admission spots. JA1.470-71; JA5.564.

Most damagingly here, Singer repeatedly and undisputedly lied about appellee Jovan Vavic, USC's storied water-polo coach. Singer lied that Vavic gave him one guaranteed spot per year on both the men's and women's water-polo teams. JA1.740. Singer lied that Vavic was his "guy" because Singer purportedly helped Vavic's children get into college and paid for team travel and coaching staff salaries. JA2.265, 269. And Singer lied that Vavic was the first coach in his web. JA1.322-23, 739-40; JA5.615.

The government knew that Singer was a liar, yet employed him to incriminate others. But when it came time to prosecute parents and coaches, the government refused to call Singer to testify. Instead, the government introduced Singer's out-of-court statements through recorded calls, emails, and other witnesses' recollections. The government knew that this evidence included Singer's lies inflating and distorting his relationship with Coach Vavic.

Yet the government saw no issue with introducing these lies without qualification. JA1.139. When the district court demurred that introducing so many lies would mislead the jury, the government at most had witnesses testify that they had not "seen any evidence" supporting particular lies. *E.g.*, JA2.265; JA2.166, 269. Then, in closing, the government replayed many of Singer's most egregious lies about Coach Vavic without disclaimers and urged the jury to take Singer's words for their truth.

Those lies devastated Coach Vavic's defense. Like many others, Vavic believed Singer was sending him actual athletes whose parents would donate. USC actively pressed coaches to find such recruits. And, like many others, Vavic believed that Singer's non-profit was providing scholarships to many talented high-schoolers, and thus saw no issue accepting scholarships for his

sons.  JA5.597.  Vavic relied on Singer's lies.  Yet the government leveraged Singer's lies to demolish Vavic's credibility.

Against that backdrop, the district court rightly granted a new trial on all counts due to the "substantial risk that the jury reached a decision based on false evidence," especially coupled with the government's own repeated factual misstatements in closing.  G.Add.41.

That glaring problem was only the tip of the iceberg.  As the district court held, a new trial was independently necessary in the interests of justice because the government's closing and rebuttal also repeatedly misled the jury as to the jury instructions.  G.Add.37-40.  None of this was an abuse of discretion, especially since the district court was able to see how pervasively these errors permeated the trial and influenced the jury.

Now, intervening, independent grounds have made clear that the district court's judgment was manifestly correct.  Months after the decision below, this Court in *United States v. Abdelaziz*, 68 F.4th 1 (1st Cir. 2023), rejected the pillars of the government's parallel Varsity Blues prosecution of parents.  Though the government all but ignores its existence, *Abdelaziz* independently supports the district court's new-trial order for two threshold reasons.  First, *Abdelaziz* vacated parents' conspiracy and related substantive

convictions because there—as here—the government charged a vast, over-arching Singer-headed conspiracy involving dozens of parents and coaches, but at most proved Singer was engaged in smaller, disconnected hub-and-spoke conspiracies. As in *Abdelaziz*, the government flooded the zone with prejudicial evidence of other actors' more culpable conduct, inviting the jury to convict Vavic based on guilt-by-mis-association. That error alone justifies vacating all the convictions.

Second, *Abdelaziz* held that when university employees allegedly accept donations *for the university* in exchange for facilitating admissions, that is not honest-services fraud under 18 U.S.C. § 1346. The government pressed that same theory as one ground for conviction here, even urging the jury to convict solely on this ground. And there is no way to tell which ground the jury picked. This flaw separately compels vacating the honest-services fraud convictions.

Having recycled the *Abdelaziz* playbook, the government cannot reasonably expect this sequel to produce different results. The government abandons any appeal as to the honest-services fraud conspiracy conviction (Count 2). Vacatur should not stop there. This Court should affirm the judgment below and the vacatur of Coach Vavic's convictions on all counts.

## STATEMENT OF THE ISSUES

1. Does *United States v. Abdelaziz*, 68 F.4th 1 (1st Cir. 2023), which issued after the district court's decision, independently require vacating all of Coach Vavic's convictions because, as in *Abdelaziz*, the government failed to prove the overarching charged conspiracy, producing a prejudicial variance?

2. Does *Abdelaziz*'s holding that university employees cannot deprive universities of their honest services by obtaining donations to universities independently require vacating the honest-services fraud conviction (Count 16)?

3. Did the district court abuse its discretion in holding that the interests of justice required a new trial due to the cumulative prejudice from the government's reliance on false statements throughout trial and in closing arguments, coupled with the government's own factual misstatements in closing?

4. Did the district court abuse its discretion in independently ordering a new trial on all counts based on the government's repeated statements in closing argument departing from the jury instructions?

## STATEMENT OF THE CASE

### A.    The Varsity Blues Cases

In March 2019, the U.S. Attorney's Office in Boston obtained indictments charging dozens of parents, coaches, and university administrators with

participating in an alleged nationwide conspiracy to fraudulently obtain admission for students as athletic recruits at Yale, Stanford, UCLA, Georgetown, Wake Forest, University of San Diego, UT Austin, and USC. One set of indictments charged 15 parents. Another indictment—at issue here—alleged that appellee Coach Vavic and 30-plus coaches, administrators, parents, and others engaged in the same overarching conspiracy. The government initially brought those charges under the Racketeer Influenced and Corrupt Organizations Act (RICO), which carries a 20-year maximum sentence.

At the center of these allegations stood Rick Singer, a renowned admissions consultant who provided "some totally legitimate services." *Abdelaziz*, 68 F.4th at 55 (internal quotation marks omitted). Singer was also a con man who relied on his towering reputation and above-board services to hide his deliberate falsification of resumes, interference with test scores, and bribes to university employees. *Id.* at 19, 55. Singer, the government charged, was the hub of this conspiracy, conspiring with individual parents to bribe particular university employees to facilitate a student's admission. Singer likewise allegedly conspired with individual coaches or administrators to facilitate particular admissions. Singer tightly controlled communications on both sides of the

equation, so that coaches, administrators, and parents only communicated with him and relied on information he conveyed. JA1.508, 512, 755-57; JA3.57.

To obtain sentencing leniency, Singer from September 2018 on operated as the government's agent in efforts to incriminate parents and university employees on recorded calls. *Abdelaziz*, 68 F.4th at 15. To obtain venue in Massachusetts, the government directed Singer to make calls from Boston, although virtually everyone in this case was in California. JA2.203, 526 (Keating).

Singer's cooperation proved problematic. He made contemporaneous notes recording that government agents were "asking me to bend the truth" and to "entrap" parents. Supp.A.28. He also reported a "[l]oud and abrasive call" where agents "continue to ask me to tell a fib and not restate what I told my clients as to where the[] money was going." Supp.A.28. For 16 months, the government withheld these notes from defendants. Dkt. 1096 at 4, Supp.A.43, 49.

Meanwhile, many parents pled guilty. And some coaches—like Yale soccer coach Rudy Meredith, plus Singer employee and former USC soccer coach Ali Khosroshahin—pled guilty to taking hundreds of thousands of dollars from Singer in cash bribes, in exchange for misrepresenting applicants as standouts

in sports they never played.  JA1.291, 753.  Their plea deals featured coopera-

tion agreements that made them key witnesses in ensuing prosecutions.

## B.  *Abdelaziz* Rejects Key Aspects of Varsity Blues Prosecutions

The government's prosecution of parents proceeded first.  That indict-

ment charged 15 parents with an overarching conspiracy to commit honest-

services fraud (18 U.S.C. §§  1341, 1343, and 1346) and 11 parents with an over-

lapping conspiracy to commit federal-programs bribery (18 U.S.C. § 666).  *Ab-*

*delaziz,* 68 F.4th at 12, 19-20.  Both Singer-led conspiracies allegedly involved

bribing university insiders to admit unqualified students as recruited athletes

in exchange for university donations and other payments.  *Id.* at 19-20.

Only parents Gamal Abdelaziz and John Wilson went to trial; all others

pled guilty.  *Id.* at 20.  Despite identifying Singer as the central figure and

using him as an agent, the government did not call him as a witness.  Instead,

the government introduced Singer's out-of-court statements through call re-

cordings, emails, and testimony from Singer's employees, other parents, and

coaches—all of whom had pled guilty to highly culpable conduct.  *Id.* at 20-21.

The jury convicted on all counts.  *Id.* at 12.

In May 2023, this Court issued its decision in *Abdelaziz*, vacating all of those convictions except Wilson's discrete tax-fraud conviction. *Id.* at 74. *Abdelaziz* held that the government's failure to prove the overarching, nationwide conspiracy charged in the indictment required vacating those convictions. *Id.* at 60. The government at most showed multiple smaller conspiracies; Singer's relationship with parents was an impermissible "rimless wheel," with Singer (the hub) interacting with many unconnected spokes. *Id.* at 44-45, 49. "[T]he dissimilarity in the conduct of the parents alleged to have conspired with Singer" further "undercut[] the reasonableness of finding a single conspiracy." *Id.* at 53. And the ensuing variance was highly prejudicial. Much of the government's case rested on comparing the defendants to highly culpable supposed co-conspirators who testified throughout trial. *Id.* at 20-21.

*Abdelaziz* also rejected the government's principal theory of honest-services fraud, holding that university employees cannot defraud their employer by obtaining donations *for* that employer. *Id.* at 27, 33. However, *Abdelaziz* held, soliciting donations in exchange for facilitating admissions could constitute federal-programs bribery. *Id.* at 22-26.

### C. The Government's Prosecution of Coach Vavic

1. Back in mid-March 2019, Jovan Vavic was coaching his 24th season as USC's legendary head water-polo coach. Even at a school renowned for athletics, Vavic stood apart. He grew up in Yugoslavia, emigrated to America in 1984, and worked his way through college at UCLA. Vavic's talent caught USC's eye. By 1994, he was head coach of USC's women's team; by 1995, he was also the men's head coach. By 2019, he had won the National Coach of the Year award fifteen times. JA1.282. His teams had won sixteen national titles. He was the "Pac-12 Coach of the Century." JA1.282. In recognition of his profile and extraordinary record, USC had given Vavic an unprecedented 12-year contract through 2021. JA5.351, 356, 387.

Water polo is an incredibly difficult sport. Six field players swim back and forth across the pool, trying to pass a volleyball-sized ball past a goalie at speeds exceeding 40 miles per hour. Play is so grueling that players rarely play a full game. Fractured ribs and concussions are common. USC thus needed large teams—sometimes 50 men and 30-plus women—to maintain a deep enough bench, develop players into starters, and create a "culture of competition" where "everybody pushes each other." JA3.471-72, 490 (Moon).

At least six days a week, Vavic started work before 6AM and worked through 10PM. He oversaw multi-hour practices for both teams. He constantly reviewed footage, then reworked game plays and practice plans. His inbox filled with 50-60 emails a day on team management issues and recruiting and fundraising demands. JA4.323, 328-29 (Cedrone).

Recruiting was a perennial challenge. Vavic leveraged his international connections to recruit a few potential Olympians per year. JA3.488-90 (Moon). To fill the many other recruiting slots, Vavic relied on assistant coaches' recommendations, but retained final approval. JA3.401-02, 473 (Moon). For these slots, the assistant coaches compiled documents and prepared athletic profiles, often without Coach Vavic's involvement. JA5.731-40, 743-44. Finding enough women players was especially tough. JA3.475, 589 (Moon).

Vavic's family, too, was all-in on USC water polo. A POLOUSC license plate adorned the family car. His wife Lisa gave up her career to pitch in with the team and raise the couple's four children, all of whom became incredible water-polo players and top USC recruits. Vavic's son Marko is now a two-time Olympian on Team USA who will compete in Paris this summer.

2. March 12, 2019 began like other days: Coach Vavic was focused on winning an away game against the University of Hawaii. Instead, FBI agents

arrested him at gunpoint in his hotel room. He was jailed for hours before receiving an indictment charging him and others—including coaches he had never met—with a nationwide RICO conspiracy. Supp.A.1, Dkt. 20.

Until then, all Vavic had gleaned was that his arrest had something to do with Rick Singer, whom Vavic knew as a prominent college consultant with many VIP clients. JA1.249-50. For years, Singer was a ubiquitous presence at USC. JA1.319, 479-80 (Khosroshahin). Singer held himself out as having real-estate developer Rick Caruso's "kids and all of his friends' kids" as clients, advertised that he "got Bono as a client," and claimed a deal with Nike to "creat[e] 32 new high schools." JA5.558, 567, 593, 606. Those boasts were false, but Singer's success was real. USC even approved Singer to present to high-school water-polo players about how to get into college. JA1.250.

Singer also lied to Vavic that his nonprofit, The Key Worldwide Foundation, was providing 1,000 scholarships to talented students. JA5.524-27, 589, 597, 678-79. Vavic thus felt comfortable accepting Singer's offer to provide scholarships from 2015 to 2018 to cover high-school tuition for Vavic's youngest two sons, who were top water-polo players. JA1.283-84. The Vavics obtained ethics advice from USC before accepting the scholarships to confirm that Singer was not a USC booster whose aid could compromise their sons'

NCAA eligibility. JA2.663, 759-60. Vavic on a recorded call even said he relied on Singer's assurance that "it was all clear and clean" because he was "so freaking concerned about making sure that [they] d[id] everything by the book" to not jeopardize his sons' NCAA eligibility. JA5.608-09. Unbeknownst to the Vavics, however, the Key Foundation was a front for Singer to funnel payments. JA4.145-47 (George).

Given Singer's formidable track record, Vavic welcomed Singer's pitching of potential water-polo recruits. Singer was intimately familiar with USC's admissions and athletic-recruiting processes, and his wealthy clients were potential donors—a "win-win," especially given USC's pressure on coaches to fundraise. *See* JA5.601. But Vavic insisted that applicants—Singer's or not—had to be water-polo players with "decent grades." JA5.486, 601, 604, 670. As Vavic told USC's athletic-recruiting subcommittee about one non-Singer recruit: "The student is a walk-on, wealthy family, solid player, hole guard … We absolutely need some players that have Trojan ties that we do not need to spend money on." JA3.597.

Recruits whose families could support USC were prized, whether Singer or others flagged them. Staff within USC's athletic advancement office asked coaches to consider applicants from wealthy families who might donate.

JA5.697-703. A member of USC's athletic department even taught coaches to use the real-estate website Zillow to assess prospective recruits' wealth. JA4.350 (Cedrone). And USC pressed Vavic to "follow up" or meet with students whose parents were "a very high end donor prospect." JA5.697-703. When Vavic responded that one such recruit would "never play for us," a staff member responded: "Would it make sense if he was a student manager? … His dad was looking at supporting the department and just trying to think of how we could help." JA5.702. Government witnesses conceded that none of this violated USC's policies. JA3.239-41 (Chassin).

As a magistrate judge in another Varsity Blues prosecution noted, the idea "that donations are not important to [USC's] decision whether to admit students … is belied by many facts that have come to light in the course of this litigation." Dkt. 913 at 18, *United States v. Zangrillo*, No. 19 Cr. 10080-19 (D. Mass. Mar. 3, 2020). Vavic even told Singer that "many people right now are not happy that USC is becoming such an academic institution" because "[p]eople want to buy their way into USC, and … now" cannot, but that Vavic "like[d]" this development even though "you lose money." JA5.593.

Unbeknownst to Vavic, however, Singer was not simply flagging water-polo players whose parents would likely donate. Singer was bribing other

coaches to falsify credentials and secure admission for students who never played their sports. JA1.709-11 (Meredith); JA4.237 (George). And Singer was encouraging less-successful coaches to keep accepting such bribes by dangling Vavic's name—alongside Coach Krzyzewski at Duke, Coach Capel at Pittsburgh, and then-USC football coach Pete Carroll—and falsely claiming they all gave Singer guaranteed recruitment spots. JA1.470-71 (Khosroshahin), 737 (Meredith); JA5.564. The government never pursued these other well-known coaches. JA2.19. And lower-profile coaches who pled guilty uniformly testified that they neither spoke to Vavic about their actions nor had any firsthand knowledge that he engaged in wrongdoing. JA1.508, 511 (Khosroshahin), 755-57 (Meredith); JA2.780 (Janke).

Nonetheless, by the time agents released Vavic on March 12, his 27-year coaching career was over. While he sat in jail, USC had summarily fired him before completing an internal investigation.[1]

### D. The Operative Indictment

In September 2020, the government obtained the operative indictment here. The named defendants were Georgetown tennis coach Gordon Ernst,

---

[1] J. Brady McCullough, *USC Fires Administrator and Coach Arrested in College Admissions Fraud Scheme*, L.A. Times, Mar. 12, 2019, https://tinyurl.com/4u5xzn6e.

Wake Forest volleyball coach William Ferguson, USC administrator Donna Heinel, and Vavic. The government eventually dismissed Count 1—the RICO conspiracy charge—in August 2021, after the district court doubted its viability. Dkt. 564 at 29-30, 32-39; Dkt. 784. Ferguson entered into a deferred prosecution agreement; Ernst and Heinel pled guilty.

With those developments, only three of the indictment's 22 counts implicated Vavic. Those charges centered on allegations that Vavic and at least *30* uncharged but identifiable co-conspirators, plus countless others, participated in overarching conspiracies to unlawfully facilitate college admissions:

**Count 2** alleged a nationwide conspiracy between Singer, the defendants, and others to commit honest-services fraud by "facilitat[ing] the admission of Singer's clients to selective colleges." JA1.89, 101-02; *see* 18 U.S.C. § 1346. As with the parents' indictment in *Abdelaziz*, the conspiracy's alleged purposes "were to facilitate the admission of applicants" and "enrich the defendants and Singer personally, and to secure additional funding for designated university accounts." JA1.89; *cf.* Dkt. 732 (*Abdelaziz* Indictment) ¶ 65, *United States v. Colburn*, No. 19 Cr. 10080 (D. Mass. Jan. 14, 2020). Alleged

means included "[c]reating athletic 'profiles' and admissions packets containing falsified credentials," concealment, and "recruiting additional athletic coaches."  JA1.90; *cf. Abdelaziz* Indictment, *supra*, ¶ 66.

**Count 3** alleged a similar nationwide conspiracy between Singer, Singer's employees, USC administrator Heinel, Vavic, and the parents of over two dozen students to commit federal-programs bribery by donating to USC or paying USC officials to obtain students' admission to USC.  JA1.91-92; *see* 18 U.S.C. §§ 371, 666; *cf. Abdelaziz* Indictment, *supra*, ¶¶ 280-81.

Finally, **Count 16** alleged that Vavic committed honest-services fraud in connection with a January 2019 call with Singer, then acting as a government agent.  The indictment alleged that this call (and 8 calls or emails involving other defendants) "execut[ed]" a pre-existing admissions "scheme."  JA1.107.

### E.    The Government's Theories and Evidence

Trial began on March 7, 2022.  Over the ensuing four-and-a-half weeks, the government shifted to alleging a nationwide conspiracy involving USC, Yale, and UCLA.  Though 60-plus paragraphs of the indictment concerned Wake Forest and Georgetown, the government presented no evidence about those schools or their coaches.  JA5.6.

The government reused many of the same theories and witnesses from the *Abdelaziz* trial, where the government had obtained convictions of two parents six months earlier. As in *Abdelaziz,* the government maintained that Singer was the central link in sprawling conspiracies, but refused to call him. *See* JA1.237. As in *Abdelaziz*, the government first spent days presenting witnesses who had pled guilty to highly culpable conduct with Singer, but who knew nothing about the actual defendant (here, Vavic). As in *Abdelaziz*, the government relied on these witnesses' testimony to imply that Vavic must have known his actions were illegal. *E.g.*, JA5.48-49, 72-73.

Specifically, the government called the following cooperating witnesses:

- **Ali Khosroshahin**, USC's former soccer coach, was fired in 2013 for poor performance, then went to work directly for Singer. Khosroshahin testified that he never worked with Vavic on recruiting and barely spoke with him. JA1.507-08, 512. Khosroshahin claimed that in 2009, when he told Vavic of an unspecified "situation that [Singer] had presented," Vavic responded, "F*** 'em. Just do it. And tell them that they're the best players you've seen." JA1.324. The district court expressed grave doubts about the reliability of this testimony and further held that even under a preponderance-of-the-evidence standard, this testimony could not show any conspiracy existed before 2013. Supp.A.150; G.Add.17 n.4.

- **Bruce Isackson**, a parent, testified that he knew nothing about Vavic, JA1.658-59, and worked with Singer to obtain his daughters' admissions to UCLA and USC. He admitted paying Singer to alter one daughter's test scores and to knowingly submitting falsified athletic profiles. JA1.592-95, 650-51. No evidence suggested that Vavic knew who Isackson was, had any involvement in his daughters' admission, or was aware of Singer's scheme to falsify test scores.

18

- **Rudy Meredith**, Yale's soccer coach, did not know or speak with Vavic. JA1.755-57. After Khosroshahin entered Singer's employ, he connected Meredith with Singer. JA1.758. Meredith admitted that Singer paid him hundreds of thousands of dollars in cash bribes to recruit students who never joined Yale's team. JA1.714-17. He joked with Singer about recruiting people who had not played soccer since age five. JA5.570.

- **Laura Janke**, a former assistant soccer coach, was fired from USC in 2014. She too worked for Singer, creating false profiles for applicants to multiple schools. JA2.775; JA3.19. She did not know Vavic beyond superficial hellos and had no direct contact with him. JA3.57.

As in *Abdelaziz,* the government then called investigating agents to read in many recorded calls and emails to and from Singer. Those agents could not give context for this evidence because they were not fully involved in the investigation. JA2.65-67 (Brown), 465 (Keating). Worse, these out-of-court statements included Singer's many fabrications about Vavic. For instance, Singer advertised that Vavic gave Singer "a spot on the boys side and a spot on the girls side" every year. JA1.739-40. Singer told parent Agustin Huneeus that Vavic was "his guy" because Singer "helped all of [Vavic's] kids get into college all over the country," "subsidize[d] his staff salaries," and paid invoices to cover Vavic's team travel costs. JA2.265, 269. This was all undisputedly false. G.Add.17 n.4, 40-41; Supp.A.150; Govt Br. 75-77; JA2.170-71. Yet all this evidence came in over defense objections. *Infra* p. 66 n.9.

The government's remaining witnesses testified that they knew nothing about Vavic's interactions with Singer. JA3.343 (Chassin); JA4.93 (Moon), 119 (Feiwell); 261-62 (George). And Vavic's recorded calls and emails with Singer were rife with Vavic's questions about individual students' qualifications—refuting the government's theory that Vavic was supposedly willing to recruit any wealthy student as a water-polo player. *E.g.*, JA5.601, 603-04, 670. The government thus relied on other coaches' testimony and Singer's out-of-court statements to portray Vavic as part of a massive, overarching conspiracy and to contend that Vavic knew all Singer recruits were illegitimate. JA5.48, 50-53. That evidence suffused the government's allegations as to Vavic's supposed participation, which centered on three students:

- **Johnny Wilson**. The government contended that in 2013, Vavic facilitated Wilson's admission as a water-polo recruit by passing on inflated accolades, in exchange for a $100,000 donation from Wilson's father to USC water polo. Johnny was an accomplished player on multiple club teams, started on his national-caliber high-school team, and was an all-conference and "all-league first team selection." Supp.A.185. Singer's notes called Wilson a "real polo player." JA2.492 (Keating); Supp.A.155. Wilson played for USC for a semester until suffering a medically-documented concussion. Supp.A.161-68; JA4.34-53 (Moon); JA5.518.[2]

_____

[2] Singer altered Wilson's swim times when preparing his materials, but there was "no evidence that Vavic was aware of these" changes. G.Add.19 n.6. Vavic, relying on those materials, accordingly described Wilson as an exceptionally fast swimmer and "walk-on" who could potentially "end up playing for us very

- **Vanessa Feiwell**. The government contended that in 2016, Vavic facilitated Feiwell's admission by forwarding a fabricated profile and relaying (based on that profile) that Feiwell would be a much-needed goalie. Singer employee Laura Janke undisputedly fabricated Feiwell's grades, water-polo accolades, and even her racial background before Vavic saw the materials. JA4.110 (Feiwell); JA5.528-32. Singer instructed Feiwell to email these materials to Vavic and remove any information indicating Singer's involvement. G.Add.22; JA5.159-60. Ultimately, USC administrator Heinel—not Vavic—worked with Singer, got Feiwell admitted, and obtained a $50,000 donation to her program from Feiwell's father. JA2.142 (Brown); JA3.64-65 (Janke); JA4.252-54 (George); JA5.554-55, 676, 745. The government nonetheless accused Vavic of accepting scholarships for his sons from Singer in exchange for recruiting Feiwell. JA5.49-50. No evidence showed that Feiwell's payments covered the scholarships. JA4.171 (George).

- **Agustina Huneeus**. The government contended that on a 2018 call, Vavic agreed to recruit Huneeus (whom Singer never named), in exchange for donations to USC's team. JA5.227-28. Vavic mentioned a $100,000 fundraising shortfall, then asked if Singer had any "water polo player[s]" whose parents might donate. JA5.597-98. Singer mentioned "a girl" at water-polo powerhouse Marin Academy and repeatedly represented, "she is a water polo player." JA5.599. Vavic discussed if she attended "my camp" for talented players; Singer said no, "[s]he's been in Europe all summer." JA5.599. Vavic asked "how good" her grades were; Singer inflated her GPA. *Compare* JA5.600 (3.8 GPA), *with* JA2.274 *and* JA5.621-22 (actually 3.21 GPA). Vavic thus asked for "her name, and info, and … resume." JA5.601. Singer promised to go through Vavic, not Heinel, so "you can get funded." JA5.601. Singer then relied on Heinel, not Vavic, to facilitate Huneeus's admission; no evidence suggested Vavic was involved. JA2.453-54, 461 (Brown);

---

soon." JA5.498. Assistant coach Moon made additional changes to describe Wilson as an "immediate impact player" before submitting the profile and testified that he had no "specific memory of any conversation with Vavic about Johnny Wilson." JA5.729; G.Add.20 n.7.

JA5.664-67. Huneeus's father later donated $50,000 to Heinel's program. JA5.667. No evidence suggests that USC's water-polo team or Vavic received any funds.

## F. Recurrent Trial Issues

The court expressed constant concerns about the government's attempts to prove a single, overarching conspiracy and other issues.

***Conspiracy Variances and Co-Conspirator Hearsay.*** The court repeatedly doubted whether the government could prove the nationwide conspiracy the indictment charged and warned of "prejudicial evidentiary spillover." JA1.49 (internal quotation marks omitted); JA4.718; JA5.8, 31; Dkt. 564 at 30, 38-39. But the court rejected the defense's request to require the government to proffer evidence of the conspiracy before presenting co-conspirator hearsay that might taint the whole trial. Dkt. 855; Dkt. 999 at 54. Instead, the court conditionally admitted all sorts of hearsay, but cautioned the jury not to take this hearsay for its truth, pending a ruling on whether the co-conspirator exception to the hearsay rule applied. JA1.626, 638-41; JA2.260-61; JA5.8-9; *see United States v. Petrozziello*, 548 F.2d 20, 23 (1st Cir. 1977).

At the close of evidence, the court (in its so-called *Petrozziello* ruling) held that "the government has not met its burden to establish a conspiracy prior to 2013" even by a preponderance of the evidence. Supp.A.151; G.Add.17 n.4. But the court found a conspiracy from 2013-2019 existed between some

unspecified grouping of 13 people—i.e., Singer; his employees Ali Khosrosha-hin, Laura Janke, and Steve Masera; coaches Rudy Meredith and Jorge Salcedo; USC administrator Donna Heinel; and parents Larry Feiwell, Agustin Huneeus, the Isacksons, and the Wilsons—"or a variance thereof." Supp.A.147, 151-52. The court did not identify what conspiracy or variance the evidence supported, yet admitted statements from *all* these alleged co-conspirators for their truth.

The court accordingly instructed the jury: "[A]s to the [out-of-court] statements of" all listed individuals—including Singer—"made in 2013 or later, you may consider [them] for the truth of the matters asserted." JA5.249. The court did not issue additional instruction as to pre-2013 statements. This instruction also apparently superseded the court's earlier instructions to not consider statements that Singer made after September 2018—when he became a government agent—for their truth. *See* JA2.513. The court also heavily redacted the indictment so that coaches Ernst and Ferguson—whom the government never mentioned—were listed as part of the conspiracy, but their alleged conduct was blacked out. Supp.A.217-61.

***False Evidence.*** Before, during, and after trial, the court conveyed concerns about misleading the jury with false statements that Singer made in

emails, on calls, and to witnesses, especially since Singer could not be cross-examined.  Supp.A.107; JA2.246-47; JA5.292.  At the court's urging, the government addressed some—but not all—of Singer's falsehoods as it elicited them.  *Infra* pp. 67-68.  Ultimately, however, the court instructed the jury that it could "consider" Singer's post-2013 statements "for the truth of the matters asserted."  JA5.249.

***Scope of Honest-Services Fraud and Bribery.***  At the jury charge conference, defense counsel objected that honest-services fraud does not encompass accepting payments that go to a defendant's employer—here, donations to USC's water-polo program.  JA4.643-45.  The court overruled that objection.  JA4.646-52.  The government's presentation and the jury instructions grouped those donations along with the scholarships for Vavic's sons and treated the two as equally valid grounds for conviction.

## G.  Closing Arguments and Verdict

The government's closing arguments replayed recordings of Singer featuring multiple lies about Vavic.  JA5.48, 70, 72.  The government misrepresented *six* times that Vavic agreed to recruit Huneeus "for $100,000," yet no evidence supported this.  JA5.62, 68, 210-11, 227-28, 238; G.Add.40.  And the

government repeatedly urged the jury to convict Vavic by pointing to other actors' acknowledged guilt.  JA5.43, 46-47.

As to all counts, the government deemed it irrelevant whether Vavic obtained donations for the team or accepted scholarships for his sons in exchange for facilitating admissions.  JA5.43-44, 74, 233.  The government also told the jury it could convict Vavic based on donations to USC so long as Vavic made some misrepresentation regarding recruits:  "If you conclude that Jovan Vavic lied … and misled USC to benefit his own program financially … you can convict him for that alone."  JA5.214; *accord* JA5.227-28, 233-34.

The jury convicted Vavic on all three counts.  JA5.342-43.

## H.    The District Court's Grant of a New Trial

1.  On September 15, 2022, the district court vacated all convictions and granted a new trial on all counts under Federal Rule of Criminal Procedure 33.  G.Add.1, 41.  The court gave two independent reasons.  *First*, the government's rebuttal repeatedly relied on factual misrepresentations.  Combined with false statements from Singer that the government elicited throughout trial and hammered in closing, the court found "a substantial risk that the jury reached a decision based on false evidence."  G.Add.41.  The court expressed concern that its *Petrozziello* ruling (which allowed the jury to consider all post-

2013 co-conspirator hearsay statements, including Singer's, for their truth) let in further "unreliab[le]" evidence, but did not revisit that ruling.  G.Add.39.

*Second*, the court held, the government's rebuttal contravened the jury instructions on bribery and honest-services fraud.  The court found an unacceptable risk that the jury convicted Vavic without finding that alleged misrepresentations were contrary to USC's interests.  G.Add.38-39.

2.  The court simultaneously denied Vavic's motion for judgment of acquittal.  The court rejected Vavic's argument that the government failed to prove the sprawling conspiracy charged.  The court agreed the indictment charged a nationwide conspiracy involving USC, Georgetown, and Wake Forest, yet the trial centered on USC, Yale, and UCLA.  G.Add.31.  Further, the court agreed that the government presented evidence of a test-taking scheme the indictment never mentioned.  G.Add.31.  But the court deemed those variances immaterial, G.Add.31-32, and found that the evidence reasonably supported that Vavic participated in a nationwide conspiracy starting in 2013.  G.Add.33-34.

As to the underlying substantive honest-services fraud and bribery offenses, the court found it unclear whether the jury convicted based on donations to USC or Singer's scholarships for Vavic's sons.  For purposes of the

motion to acquit, the court found sufficient evidence that the scholarships could be a "bribe or kickback," and did not consider whether donations to USC could have supported conviction. G.Add.29, 35-36, 39-40.[3]

The government (at 39) accepts that Coach Vavic's conviction under the broadest and most significant count (the Count 2 conspiracy to commit honest-services fraud) cannot stand. Nonetheless, the government appeals the district court's decision vacating Vavic's convictions on Counts 3 (conspiracy to commit federal-programs bribery) and 16 (standalone honest-services fraud).

\*       \*       \*

Despite charging over 50 people, just three Varsity Blues cases went to trial: Abdelaziz, Wilson, and this one. Save for a tax conviction, no convictions from those trials currently stand. Reflecting on this record, the former lead prosecutor dismissed the relevancy of convictions. He touted the prosecutions as an "impact case" to alter admissions practices, whereby defendants were "ridiculed, humiliated, stained and had major disruptions" to their careers.[4]

---

[3] Vavic preserves his Rule 29 grounds for judgment of acquittal for any later proceedings because that order cannot be cross-appealed now. *United States v. Carpenter*, 494 F.3d 13, 26 (1st Cir. 2007).

[4] Daniel Libit, *Varsity Blues Affair Winds Down as Ex-USC Official Now Free*, Sportico, July 12, 2023, https://tinyurl.com/cdny4pm9.

That was certainly true for Jovan Vavic. After USC summarily fired him, defending against prosecution decimated the Vavics' finances. They sold their dream home to cover legal fees. Their youngest son, Stefan—whom other coaches said "could have been the best out of the four" children, JA3.462 (Moon)—was a top USC-bound recruit when his father was arrested and fired. USC never let him play a single game. JA3.464 (Moon).

Meanwhile, without Coach Vavic, USC water polo has faltered, no longer dominating the top tournament seeds. Yet the USC Athletics website still boasts that Vavic "has the most team titles of any USC head coach in history."[5] To this day, USC has never returned hundreds of thousands of dollars in donations from Singer's clients. G.Add.39.

## SUMMARY OF ARGUMENT

I. Since the district court's opinion, this Court decided *Abdelaziz*, which vacated materially identical convictions for parents charged with a materially identical overarching admissions conspiracy. *Abdelaziz* independently justifies the district court's decision to order a new trial on all counts for another reason: the government failed to prove the overarching conspiracy charged in the indictment, resulting in a prejudicial variance.

---

[5] *Jovan Vavic*, USC Men's Water Polo, https://tinyurl.com/45ajurmf.

A.  Here, as in *Abdelaziz*, the government charged a classic, impermissible "rimless wheel" conspiracy with a central hub figure, Singer, who conspired with many parallel spokes.  But the spokes did not conspire with each other.  Indeed, the indictment here incorporated the 15 parents charged in *Abdelaziz* as co-conspirators, then featured 30-some additional co-conspirators at multiple schools who each dealt with Singer.  As the Supreme Court and this Court have held, that is not a single conspiracy—and certainly not one that *Coach Vavic* knowingly joined.

To start, the government failed to show that Vavic *knew* of the broader, overarching conspiracy supposedly involving dozens of coaches, parents, and Singer associates nationwide.  The trial evidence showed that Vavic only dealt with Singer; other coaches who testified at trial confirmed they did not know Vavic and lacked direct knowledge of his interactions with Singer.

Like in *Abdelaziz,* the government also failed to prove that alleged co-conspirators shared a collective "common goal."  *Abdelaziz* squarely rejects the government's theory that Vavic and other coaches shared the "common goal" of enriching themselves personally or getting donations for their programs.  Moreover, significant evidence showed that coaches' and administrators' interests were at odds because they competed over donations.

Finally, like in *Abdelaziz,* the government never showed interdependence within its charged conspiracy, i.e., that Vavic himself believed that the success of his dealings with Singer depended on the success of others' endeavors. Vavic never worked with other coaches, managed USC water-polo recruitment, and had no reason to think Singer's interactions with others had any bearing on him. Even within USC, if Vavic thought about coaches or administrators at all, he considered them competitors for donations.

B. The ensuing variance between the government's proof and the vast conspiracy it charged was blatantly prejudicial. Like in *Abdelaziz*, the variance created classic guilt-by-association evidentiary spillover—something the government encouraged. The government overwhelmed the jury with witnesses' confessions about their guilty knowledge and mocked the notion that Vavic was any different. And the government leveraged evidence of others' far worse conduct (taking personal bribes, falsifying credentials, inflating test scores, etc.) to malign Vavic as equally culpable. The government made these same tactical moves in *Abdelaziz*, down to the same phrases in rebuttal. Vacatur there warrants vacatur here.

Indeed, the prejudice here was even worse than in *Abdelaziz* because the government used the single-conspiracy charge to swamp the jury with devastating—and false—statements from Singer, as well as inflammatory hearsay from others. At the close of evidence, the court admitted all post-2013 co-conspirator hearsay statements, then instructed the jury it could consider all that evidence—including Singer's lies—for their truth. Further, the court found that the government had not proven a conspiracy before 2013, yet admitted prejudicial pre-2013 hearsay statements. This deluge doomed Vavic's defense and encouraged the jury to treat Vavic as one more interchangeably guilty cog in Singer's wheel.

II. *Abdelaziz* independently requires vacating Vavic's standalone honest-services fraud conviction (Count 16).

As in *Abdelaziz*, the government pressed the theory that university coaches can commit honest-services fraud by obtaining donations to the university—even when, as here, they do not misappropriate the funds. *Abdelaziz* squarely rejected that theory. The government's alternative theory—that Vavic committed honest-services fraud by purportedly recruiting student Vanessa Feiwell in exchange for scholarships for Vavic's sons—cannot salvage the conviction. This Court has repeatedly held that where one possible basis

for conviction was legally erroneous, the verdict must be set aside. And, as the district court observed, the jury may have convicted Vavic based solely on the university payments, rather than the scholarships. G.Add.38-39. The government even urged the jury to convict on all counts based on the donations alone.

III. Even without *Abdelaziz*, the district court correctly identified prejudicial errors so extreme as to warrant a new trial on further grounds. To start, the government knew that many of Singer's statements were lies and introduced them anyway. Then, in closing, the government invited the jury to take damaging falsehoods about Vavic for their truth, while adding its own misrepresentations of the evidence in rebuttal. The court came nowhere close to abusing its discretion in ordering a new trial based on "a substantial risk that the jury reached a decision based on false evidence." G.Add.41.

A. The government cannot obtain convictions using false evidence. Yet the government inundated the jury with incredibly harmful lies that Singer relayed about Vavic in emails, on recorded calls, and to other witnesses—some with ineffectual corrections and others without any qualification. The government knew Singer was lying, and that introducing his statements this way would eliminate any opportunity for cross-examination. Then, in closing, the

government omitted any disclaimers and invited the jury to take various Singer lies as truth.

B.  Compounding the obvious prejudice, the government misrepresented *six* times during closing and rebuttal that Vavic supposedly agreed to recruit a student (Huneeus) "for $100,000."  No evidence supported that accusation.  The district court did not abuse its discretion in considering this misrepresentation—combined with the litany of lies the jury heard from Singer—so prejudicial as to necessitate a new trial.

IV.  A final, independent ground supports a new trial.  As the district court held, the government's rebuttal misled the jury by "flatly ignor[ing]" the court's instructions about what the government needed to prove to show honest-services fraud and federal-programs bribery.  G.Add.39.

A.  In closing and rebuttal, the government argued that it could show that Vavic's alleged actions were "contrary to the interests" of USC—as the instructions required for both honest-services fraud and bribery—just by showing that Vavic made misrepresentations to USC.  That argument "flatly ignored" the court's instructions that misrepresentations alone do not show that accepting donations was contrary to USC's interests.  G.Add.39.

B.  The government's misstatements were severe and recurrent, no curative instructions were given, and the trial evidence was far from "overwhelming."  The district court did not abuse its discretion in finding that these misstatements "so poisoned the well" as to require a new trial.

## STANDARD OF REVIEW

This Court reviews the ultimate grant of a new trial for abuse of discretion.  *United States v. Carpenter*, 494 F.3d 13, 22 (1st Cir. 2007).  This Court decides de novo: (1) whether statements in closing were improper, *id.*; (2) whether sufficient evidence supports the charged conspiracy and whether any variance was prejudicial, *Abdelaziz*, 68 F.4th at 42, 55; and (3) "rulings of law" underpinning evidentiary decisions, *Cameron v. Otto Bock Orthopedic Indus., Inc.*, 43 F.3d 14, 16 (1st Cir. 1994).  This Court reviews evidentiary decisions for abuse of discretion.  *United States v. Kilmartin*, 944 F.3d 315, 335 (1st Cir. 2019).  This Court reviews unpreserved objections to closing arguments for plain error.  *United States v. Canty*, 37 F.4th 775, 790 (1st Cir. 2022).  This Court may affirm the judgment below on any independently sufficient ground.  *United States v. Robles*, 45 F.3d 1, 5 (1st Cir. 1995).

# ARGUMENT

## I. *Abdelaziz* Independently Requires Vacating the Convictions Because the Government Failed To Prove the Single, Sprawling Conspiracy Charged in the Indictment

Since the district court's grant of a new trial, this Court has twice vacated convictions where the government charged a single, broad conspiracy but proved (at most) only that defendants joined a narrower one. *Abdelaziz* held that the government failed to prove the vast Singer-run conspiracy it charged here, and that the variance between that charge and the government's proof required vacating parents' convictions. 68 F.4th at 42, 57. This Court vacated other conspiracy convictions for the same error. *United States v. Falcón-Nieves*, 79 F.4th 116, 136-37 (1st Cir. 2023).

The government ignores *Abdelaziz* even as it abandons any appeal as to the main conspiracy conviction (Count 2). But, independent of the district court's grounds for a new trial, *Abdelaziz* compels vacating all the convictions here. Both cases charged the same, overbroad, Singer-run conspiracy. In both cases, the government used copious witness testimony and hearsay from other parents and coaches to portray the defendants as equally guilty. In both cases, the variance between the sprawling, charged conspiracy and the proof

at trial invited the jury to "transfer [] … guilt" to the defendant by using "evidence incriminating defendants in another conspiracy in which the particular defendant was not involved."  68 F.4th at 54 (citation omitted).  And in both cases, that evidentiary deluge of others' guilt overwhelmed the individual defendants' objections that they believed Singer was above-board, were unaware he inflated students' credentials, and understood that USC legitimately welcomed recruiting players whose parents would donate.  JA5.93, 102-03, 107-09.

## A.    The Government Did Not Prove the Charged Conspiracies

To convict someone of participating in a single, sweeping conspiracy, the government must prove beyond a reasonable doubt that the specific defendant knew that the single conspiracy charged in the indictment existed, and agreed to join.  *Abdelaziz*, 68 F.4th at 43.  This Court reviews de novo whether the evidence, viewed most favorably to the verdict, shows "beyond a reasonable doubt that the defendant[] agreed to join the broader charged conspiracy."  *Id.* at 42.  The answer here is resoundingly no.

1. Like in *Abdelaziz*, the charged conspiracy here was "a sprawling web that stretched from coast to coast."  JA1.220; *accord* JA1.71, 75; *Abdelaziz*, 68 F.4th at 40.  Like in *Abdelaziz*, this sprawling web involved a classic, "imper-

missible 'rimless wheel'" conspiracy, with "a single hub figure"—Singer—connecting disparate spokes. *See* 68 F.4th at 40-41. Singer worked with individual parents to leverage university insiders to obtain their children's admission. And, the government charged, Singer and employees recruited individuals at various universities, then bribed them in exchange for facilitating a particular student's admission. JA1.72-74; Govt Br. 5-6.

The rimless wheel thus involved dozens of spokes. Indeed, the indictment here surpassed *Abdelaziz,* identifying over 30 people involved in the overarching conspiracy, including Vavic and three other defendants; Singer; four Singer employees; 11 identifiable parents; and parents of more than two dozen other students. JA1.77-78, 80-82, 86-88. The indictment alluded to yet more co-conspirators, including all parents who relied on Singer's "side door." *See* JA1.76.[6] As the Supreme Court has long held, such schemes involve (at most) multiple mini-conspiracies, not a single, sprawling one. *Kotteakos v. United States*, 328 U.S. 750, 755 (1946).

_____

[6] Like in *Abdelaziz*, the indictment here charged overlapping conspiracies: a single honest-services-fraud conspiracy alleging nationwide conspirators and multiple universities, and two federal-programs-bribery conspiracies allegedly involving individuals nationwide working to admit Singer students at USC and Georgetown, respectively. JA1.89-93. We treat them together because all were broader than anything the evidence showed, and the government intermingled all the evidence. *See Abdelaziz*, 68 F.4th at 40 n.24.

2. As in *Abdelaziz,* the government's evidence never "closed the rim." The government failed to prove Vavic knew of the broader conspiracy. And even when defendants know of a broader scheme, that is not dispositive. Defendants might be mere spokes operating on parallel tracks with a central hub—part of multiple, smaller conspiracies, not a single, giant one. This Court thus asks whether alleged co-conspirators in the charged, broader conspiracy shared a "common goal," and whether the individual defendant understood his efforts to be "interdependent" with other co-conspirators' unlawful conduct. *Abdelaziz*, 68 F.4th at 42, 49 (citation omitted). Here, no common goal linked Vavic with others; *Abdelaziz* forecloses the government's theory that self-enrichment can be a common aim. Likewise, Vavic did not understand his recruiting for the water-polo program he controlled to depend on others working with Singer.[7]

**Knowledge of the Overall Conspiracy.** "[N]o one can be said to have agreed to a conspiracy that they do not know exists," so "proof of knowledge

---

[7] This Court also confirms whether participants "overlap[ped]," but that factor carries little weight because such overlap is frequent for single conspiracies and impermissible rimless wheels. *Abdelaziz*, 68 F.4th at 53.

of the overall scheme is critical." *Falcón-Nieves*, 79 F.4th at 135 (citation omitted). But, as the district court found, "the government did not offer evidence that the individual participants knew of the specific arrangements that different coaches and administrators made for their personal benefit, or even the nature of the different transactions." G.Add.33.

Indeed, Vavic dealt solely with Singer. JA4.602-05. The corrupt coaches who testified for the government conceded that they never spoke with Vavic about their activities (or knew him beyond hellos, if at all). JA1.508, 512 (Khosroshahin); JA1.755-57 (Meredith); JA3.57 (Janke). USC administrator Heinel's guilty plea averred that she worked alone at USC. Dkt. 1019 at 43. Insofar as Vavic knew that Singer worked with other coaches, he had no reason to believe Singer was bribing them—especially since Singer engaged in myriad legitimate activities. That should have ended the matter. *See Abdelaziz*, 68 F.4th at 55; *accord Falcón-Nieves*, 79 F.4th at 136.

**Common Goal**. True co-conspirators share a collective goal that spurs them to "benefit the group as a whole." *Abdelaziz*, 68 F.4th at 44 (citation omitted). But both *Abdelaziz* and this case fit the opposite mold: the government alleged that the admissions conspiracy's purpose was to enrich coaches,

administrators, and Singer. That theory cannot support finding a single conspiracy: While people "engaged in similar acts for similar reasons … to benefit themselves" are pursuing an identical goal—self-enrichment—they do not share that goal *in common*. *Id.* (citation omitted).

Thus, *Abdelaziz* refused to infer that the parents were all part of a single conspiracy just because they shared the "similar unlawful goal[]" of "getting their own children into particular universities through illicit means." *Id.* at 45. "The relevant question" was "whether the nature of the alleged scheme [wa]s such that it would be reasonable to infer that <u>any</u> parents who sought [Singer's assistance] shared a goal of getting children <u>other</u> than their own into any university just because they sought such assistance for their own children." *Id.* On that score, this Court endorsed the "opposite inference": parents "were indifferent or even adverse to whether other parents' children were admitted," given competition for admissions spots. *Id.* at 46.

*Abdelaziz* is fatal to the government's mirror-image claim here: that Vavic and other university employees joined a single conspiracy because they shared the aim of obtaining "payments" that benefitted them "personally" or "professionally." Govt Br. 6; *see* JA1.89; JA5.60. The district court below ac-

cepted that self-enrichment was a viable "common goal[]." G.Add.33. But *Ab-delaziz* requires "a goal beyond [participants] benefiting themselves." 68 F.4th at 46. And, critically, the government never showed that Vavic had any stake in enriching *other* coaches or administrators. *Id.* at 44. As with the parents, coaches were "indifferent or even adverse" to whether others facilitated admission for Singer's students. *Id.* at 46. Vavic had no interest in whether students were admitted elsewhere as crew, sailing, or football recruits.

Even with respect to USC, the government introduced significant evidence that coaches and administrators were competitors because parents' donations to one program were a lost opportunity for others. For instance, Vavic bemoaned instances where parents donated to general USC funds rather than the water-polo team specifically. JA5.602; Supp.A.157. The government then mocked Vavic for "complain[ing] about the fact that somebody gave money to the university and not to his team." JA5.234; *see also* JA5.597, 600-02. Such competition is the antithesis of a common goal uniting supposed co-conspirators.

Indeed, Singer fostered competition by working through a particular university employee to obtain a particular student's admission, then funneling

donations only to that employee.  JA1.85, 339-41, 716; JA2.524.  Witnesses tes-

tified that USC administrator Heinel aggressively monopolized Singer re-

cruits and cut coaches (including Vavic) out to keep all donations from Singer's

clients for her program.  JA1.532-34, 541-45 (Khosroshahin).  Singer claimed

that Heinel insisted that Singer stop "going around [her]" and "just come di-

rectly to [her]."  JA5.560, 566; Supp.A.156.  And Singer (falsely) promised

Vavic he would not "tell [Heinel] about this girl" (Huneeus) so "you can get

funded."  JA5.601; Supp.A.157.  Ultimately, Heinel, not Vavic, facilitated

Huneeus's admission, so Heinel's fund, not Vavic's, received donations from

Huneeus's father.  JA5.658-67; JA2.453-54, 461 (Brown).  The same went for

Feiwell:  Heinel, not Vavic, got Feiwell admitted and received a donation from

her father.  JA2.142 (Brown); JA3.64-65 (Janke); JA4.252-54 (George).

That all points to competition, not any common goal, in the same way

that parents who worked with Singer competed with each other for admissions

spots.  The government below emphasized that Singer paid *other* coaches and

associates to recruit additional coaches.  Dkt. 1320 at 22; *accord* G.Add.28-29,

33 (detailing evidence that Singer paid coach Meredith and then-employee

Khosroshahin kickbacks for recruiting others).  But that evidence underscores

that coaches *lacked* any inherent stake in getting other coaches to work with

Singer and required the incentive of further self-enrichment. Unlike those coaches, Vavic never took Singer up on his offer of more funding "if you can help me get somebody … [to] use a [recruiting] spot at a Harvard, at a Princeton." JA5.604-05; Supp.A.157; *see United States v. Glenn*, 828 F.2d 855, 859 (1st Cir. 1987) (awareness of separate conspiracy does not show participation). And, again, the evidence at trial supported that Vavic's recruiting was lawful, and that he understood Singer was matching wealthy student-athletes with coaches so that parents would donate to those programs. *Infra* pp. 85-87; *supra* pp. 13-14.

**Interdependence**. Also missing from the government's case: evidence that Vavic believed his ability to obtain admission for Singer's students as water-polo recruits depended on the success of others' unlawful conduct. *See Abdelaziz*, 68 F.4th at 48; *United States v. Dellosantos*, 649 F.3d 109, 117 (1st Cir. 2011). At most, Vavic "acted independently and was an end unto [him]self"— a telltale sign that, at most, there were multiple, smaller conspiracies with Singer, not a unifying scheme. *United States v. Chandler*, 388 F.3d 796, 811 (11th Cir. 2004).

Again, *Abdelaziz* is dispositive. There, the specific parents did not believe their success in using Singer "in some way depende[d] on Singer's work

with other parents." 68 F.4th at 50. Rather, these parents viewed themselves as competitors for scarce admissions spots. *Id.* at 46. Similarly, this Court in *Falcón-Nieves* declined to find interdependence when two defendants each engaged in parallel schemes with the same "hub" individual in exchange for "a stream of benefits," since the defendants were uninvolved in each other's unlawful work. 79 F.4th at 135-36. And this Court in *Glenn* refused to find interdependence where a defendant involved in a hashish-smuggling conspiracy knew some of his confederates were also engaged in a marijuana-smuggling conspiracy, but did not aid their efforts. 828 F.2d at 859.

So too here. The government's witnesses testified that Vavic never worked with the other coaches. JA1.508 (Khosroshahin), 658-59 (Isackson), 755-57 (Meredith); JA3.57 (Janke). He had no inkling they were taking personal bribes from Singer to falsely present non-athletes as top prospects—something Vavic never did. Vavic plainly did not believe his ability to get Singer's or anyone else's students admitted to USC as water-polo recruits depended on others' endeavors. In the government's own telling, Vavic controlled USC water-polo recruiting slots. JA5.47, 58. He was indifferent to other universities' and other sports' recruiting. He certainly did not care what Wake Forest's volleyball coach, Georgetown's tennis coach, or various soccer

coaches did. Even within USC, he viewed himself as competing with Heinel for parents' donations, *supra* pp. 41-43—the opposite of interdependence. *Abdelaziz,* 68 F.4th at 49.

Without the benefit of *Abdelaziz*, the district court relied on Vavic's supposed "aware[ness] of other participants in the side-door scheme" as proof of interdependence. G.Add.34. But, as *Abdelaziz* held, "mere awareness of a common figure's involvement in similar dealings with similarly situated people is far from enough to show interdependence." 68 F.4th at 51. It thus did not matter that the defendant parents knew that other parents were paying Singer to persuade university insiders to admit their children as athletic recruits in exchange for payments. *Id.* And evidence of Vavic's awareness of others' conduct is much weaker. At most, the district court suggested, Vavic knew USC administrator Heinel was working with Singer—hardly awareness of a nationwide, multi-school, multi-sport conspiracy, especially given that Singer engaged in a mix of lawful and unlawful activities.

The district court further reasoned that Vavic "understood that his interactions with Singer would not have been feasible without the participation and secrecy of other coaches, administrators, and parents," but cited no sup-

porting evidence. G.Add.34. Again, *Abdelaziz* rejected as unsupported a similar claim that adding more participants made the "interconnected web of relationships and finances" harder "to unravel." 68 F.4th at 50. Every conspiracy depends on secrecy. Were that enough, every rimless-wheel arrangement could be a single conspiracy, notwithstanding the Supreme Court's rejection of that proposition a half-century ago in *Kotteakos*.

Finally, the government below contended that Vavic's willingness to refer other coaches to Singer showed interdependence. Dkt. 1320 at 22-23. The government in *Abdelaziz* similarly cited "evidence that Wilson as well as other parents 'referred and recruited other parents.'" 68 F.4th at 52. And the government in *Kotteakos* stressed that the defendant and alleged co-conspirators had referred others to the hub figure in the fraudulent-loan scheme. *Id.* at 53. To no avail: as *Abdelaziz* held, referring someone to a hub figure—Singer—does not automatically show that the defendant "thought that Singer's work with other[s] would be beneficial to his own success." *Id.*

The evidence here was weaker still—too weak to infer that Vavic even referred other coaches. The government pointed to Khosroshahin's testimony that in 2009, in response to a question about working with Singer, Coach Vavic told him, "F*** 'em. Just do it." JA1.556. But as the district court noted,

Khosroshahin's precise recall of Vavic's supposed words was in tension with his "generally poor recollection," and the record did not reflect "what exactly Vavic was responding to." Supp.A.150. The admissibility of that testimony was dubious. *Infra* pp. 54-56. Regardless, the court held, insufficient evidence showed Vavic was part of *any* conspiracy when he supposedly spoke with Khosroshahin. Supp.A.149; G.Add.17 n.4. Even under the government's view of the case, interdependence is manifestly lacking.

### B.    The Variance Was Highly Prejudicial

"[T]he more sweeping the charged conspiracy, the higher the bar for showing that the evidence was 'overwhelming'" and that the variance "was harmless." *Abdelaziz*, 68 F.4th at 60 (citation omitted). The Supreme Court vacated the convictions in *Kotteakos* despite clear proof of "eight separate" conspiracies, due to the inescapable risk that the jury convicted any given defendant using evidence about others' conduct. *Id. A fortiori*, this Court found prejudice where the parents' indictment described "at least fifteen" conspiracies involving distinct parents. *Id.*

By that metric, the charged conspiracy here is off the charts. The indictment described 20-plus parents, coaches, administrators, and Singer employees as conspirators, and referred to *dozens* of additional parents and other

unidentified co-conspirators. *Supra* p. 37; JA1.77-78, 80-82, 86-88; *see* Supp.A.147, 152. The conspiracy was so sprawling that the government and district court deemed it immaterial that the indictment charged a conspiracy involving USC, Georgetown, and Wake Forest, yet the trial centered on USC, Yale and UCLA. G.Add.31. The court blacked out for the jury the indictment's allegations about the Georgetown and Wake Forest coaches' alleged conduct, yet left their names—telegraphing that the conspiracy supposedly went well beyond the trial testimony. Supp.A.217. A conspiracy that is so vast that supposed co-conspirators at any given university are interchangeable raises grave concerns that the jury will likewise treat the defendant as one more guilty cog.

1. **Evidentiary Spillover**. As the district court warned, the government's failure to prove "a single overarching conspiracy at trial" would "risk[] prejudicial 'evidentiary spillover'" and a "fatal appellate issue." JA1.49; JA5.8. That risk materialized. As in *Abdelaziz*, the "overarching conspiracy charge enabled the government to introduce evidence of other [alleged co-conspirators'] corrupt intent and actions in working with Singer," thereby creating "an unacceptable risk that the jury … may have imputed other [actors'] culpable

mental states to the defendants."  68 F.4th at 57; *accord Falcón-Nieves*, 79

F.4th at 136-37 (similar prejudicial spillover).

***Guilty Knowledge.***  The government used the single-conspiracy charge

to overwhelm the jury with other coaches' and parents' confessions that they

knew they were breaking the law, then imputed that guilty knowledge to

Vavic.  For the first five days of trial, the jury heard former coaches

Khosroshahin and Meredith and parent Isackson profess awareness that

Singer was unlawfully bribing coaches and administrators.  JA1.291-92, 336,

339-40, 527, 555, 649-51, 715, 743.  Isackson repeated testimony that "[t]he mi-

nute he talked" to Singer, he knew Singer's side door "wasn't legitimate."

JA1.70; *see Abdelaziz*, 68 F.4th at 55-56.  Then former assistant coach Janke

doubled down on awareness of wrongdoing.  JA3.35.  None actually worked

with Vavic (or even, in most cases, knew him).  Yet that copious testimony—

staged at the start of trial, before any specifics about Vavic—predisposed the

jury to "unfairly transfer[] … the guilt relating to" these witnesses to Vavic.

*See Abdelaziz*, 68 F.4th at 55 (quoting *Dellosantos*, 649 F.3d at 125).

The government's closing even *encouraged* guilt-by-transference.  Just

as in *Abdelaziz*, the government urged: "[Y]ou know … the defendant joined

that scheme willfully and that he knew it was wrong … because Ali

K[hosroshahin] and Laura Janke told you that they knew it was wrong from the very beginning." JA5.52; *cf. Abdelaziz*, 68 F.4th at 58. The government re-read those witnesses' damning admissions of their own guilty knowledge, JA5.52-54, then circled back again in rebuttal, JA5.228. As in *Abdelaziz*, "[t]hese statements by the government itself seriously undermine" the notion "that the jury would not have considered evidence regarding [others] in determining what the defendant[] had done." 68 F.4th at 58.

***Dissimilar Conduct.*** The government leveraged evidence of others' far worse conduct to tank Vavic's defense that his dealings with Singer were innocuous. Khosroshahin and Janke were coaches who later worked directly for Singer; they admitted to falsifying students' credentials wholesale, obtaining admission for multiple students who did not even play soccer, lining their own pockets with bribes, and getting paid $25,000 kickbacks to recruit other coaches. JA1.337; JA3.20. Yale coach Meredith personally received $400,000 for recruiting one student. JA1.743. Parent Isackson paid Singer to have proctors inflate his children's test scores. JA1.650-51; *see* G.Add.31-32. And the government introduced out-of-court statements from Singer that Heinel was "selling spots" and falsely recruiting non-athletes. JA1.575; JA5.560-61; Supp.A.156.

Vavic did nothing of the sort. Yet, the government's rebuttal mocked him as "[t]ruly the unluckiest man in the world" for claiming to be "the only one who is in the dark" when all the other witnesses were "in on it … in exchange for money." JA5.209, 212; *cf.* Supp.A.271 (rebuttal deriding Wilson and Abdelaziz as "the two unluckiest men in the entire world"). Surmounting that parade of culpability was an impossible task.

2. **Prejudicial Hearsay**. The government used the sprawling single-conspiracy charge to engage in trial-by-hearsay, where much of the jury's understanding of Singer's college-admissions scheme came from Singer's and others' out-of-court statements in calls and emails instead of direct testimony. These out-of-court statements were admissible only because the district court applied the co-conspirator exception, finding by a preponderance of the evidence at the close of trial that a broad conspiracy involving Vavic and 13-plus people—or "some variance thereof"—existed from 2013 on. Supp.A.151-52 (*Petrozziello* ruling). That ruling was procedurally and substantively improper, and all but guaranteed severe prejudice to Vavic's defense.

The court rightly acknowledged an "enormous problem" if no single, broader conspiracy were proven, and expressed doubts about the *Petrozziello* ruling in its new-trial order. *Supra* pp. 25-26; JA1.626; G.Add.39. Those

doubts were well-founded:  the *Petrozziello* ruling allowed the jury to consider hearsay statements from 13 supposed co-conspirators—including Singer—for their truth.  Yet the court never even found by a preponderance that a single conspiracy involving *those* conspirators existed.  All the court found was that a conspiracy or "a variance thereof" existed, Supp.A.151-52—opening the door for the government to convict based on an amorphous conspiracy whose contours no one ever defined.

The timing of the court's hearsay ruling maximized the risk of prejudice. The court overruled Vavic's request to rule on the scope of the conspiracy and admissible evidence at an early stage—the practice in other circuits and something this circuit permits.  Dkt. 1278 at 43, Dkt. 855 at 6-9; *see United States v. Mangual-Garcia*, 505 F.3d 1, 8 (1st Cir. 2007); *United States v. Stephenson*, 53 F.3d 836, 842 (7th Cir. 1995); *United States v. Macklin*, 573 F.2d 1046, 1049 n.3 (8th Cir. 1978).  By failing to resolve *what* conspiracy existed and deeming everyone on the 13-person list co-conspirators, the court predisposed the jury to accept a sprawling conspiracy based on inadmissible evidence.

The jury instructions implementing that holding then invited the jury to take even *Singer*'s post-2013 statements "for the truth of the matter asserted," even when they included highly prejudicial lies.  JA5.249; *infra* pp. 63-74.  The

final instructions let the jury consider even out-of-court statements that Singer made after September 2018 for their truth. By then, Singer was a government agent whose hearsay statements could not be admitted for that purpose. *See United States v. Pérez-Vásquez*, 6 F.4th 180, 197 (1st Cir. 2021).

The result of all this was a trial tainted by prejudicial hearsay. Without the district court's flawed application of the co-conspirator exception, the jury would never have heard Singer brag to Meredith about supposedly working with Vavic before 2009, paying Heinel and officials at 10 other schools for improper student admissions, bribing other coaches and paying Meredith kickbacks for them, or falsifying doctors' notes to conceal a student's inability to play competitive soccer. JA5.559-67, 570-77, 615; Supp.A.156, 158. That hearsay was even more damaging because the district court had found that not even a preponderance of the evidence supported the notion that Vavic worked with Singer before 2013. G.Add.17 n.4; Supp.A.151. Yet the jury kept hearing the opposite. JA1.323, 739-40; JA5.615; Supp.A.156.

Further, without the district court's co-conspirator hearing ruling, damaging hearsay from UCLA coach Salcedo about knowingly accepting personal bribes to falsify students' admission would never have reached the jury. JA1.342-43. Nor would the jury have heard calls where Heinel instructed

Singer not to have parents make payments "so close" to admissions letters, JA5.656-57; Supp.A.159, or where Huneeus's father asked Singer whether there was "any risk that this thing blows up in my face?" JA5.634; Supp.A.158. As in *Abdelaziz*, it is unlikely those statements would have "been admissible against [Coach Vavic] as proof of [his] participation in narrower conspiracies." 68 F.4th at 57.

3. **Related Rule 403 Problems.** Finally, the government improperly leveraged the co-conspirator exception to hammer prejudicial statements that should have been independently excluded under Federal Rule of Evidence 403.

No evidence is admissible if it is unduly prejudicial and its probative value is low. *Abdelaziz*, 68 F.4th at 57 & n.35. Yet here, the district court simultaneously found that the government had "not met its burden to establish a conspiracy prior to 2013," Supp.A.151, then admitted numerous statements insinuating that Vavic and Singer had worked together to admit Singer's students since at least 2009. By definition, the probative value of such statements was low, and the prejudice was astronomical.

Most troublingly, the court allowed ex-USC coach Khosroshahin to testify that in 2009, when Khosroshahin supposedly expressed reservations about working with Singer, Singer told him to talk to Vavic because Singer had "been

working with [Vavic] in the past," and "was providing donations to [Vavic's] program." JA1.322-23, 325. The court allowed the jury to consider those statements as bearing on *Khosroshahin's* state of mind, which has no relevance to whether *Vavic* knowingly agreed to join a conspiracy and to otherwise act unlawfully. JA1.641; JA4.715. The court then allowed the jury to consider "for their truth" Singer's similar out-of-court statements about supposedly working with Vavic before 2013. JA1.739-40; JA4.715; JA5.615.

Yet, as the district court recognized, these statements were deeply problematic. The court held that there was "no corroborating evidence" of Singer's claims to have worked with Vavic before 2013, and a "serious question" of what Singer told Khosroshahin about Vavic. Supp.A.150-51. The court also doubted the reliability and probative value of Khosroshahin's accompanying testimony. G.Add.17 nn.4-5. Those doubts should have stopped the jury from hearing any of this. Instead, the court's rulings let the government wield this evidence as supposed proof that Vavic was the original co-conspirator linking ensuing coaches to Singer—a point the government emphasized throughout closing. JA5.43, 211-12, 219, 240. The ensuing prejudice from the government's impermissible inferences was incalculable. *See United States v. Kaiser*, 609 F.3d 556, 572-73 (2d Cir. 2010).

*     *     *

The government's failure to prove the overarching nationwide conspiracy charged in the indictment requires vacating all of Vavic's convictions. The government used powerful confessions of wrongdoing from putative co-conspirators, plus copious hearsay from Singer and others, to malign Vavic as equally culpable. That prejudicial variance plainly affected all counts. Indeed, the government refused the district court's invitation to mitigate any "prejudicial variance" by separating out USC-specific evidence from the "overarching conspiracy." JA5.29-31. There can be "no reassurance that jurors were able to compartmentalize the evidence" when the government constantly intermingled it. *Abdelaziz*, 68 F.4th at 61 (cleaned up).

## II.  *Abdelaziz* Requires Vacating the Honest-Services Fraud Conviction

After the district court's ruling, *Abdelaziz* also held that university employees cannot commit honest-services fraud by obtaining money for the universities themselves. 68 F.4th at 27, 33. The government undisputedly pressed that same, invalid theory here. Govt Br. 61. Independent of the district court's grounds for a new trial below, *Abdelaziz* thus requires vacatur of the standalone honest-services fraud conviction (Count 16). The indictment, jury instructions, and general verdict form invited the jury to convict Vavic on

that count *either* by finding that he obtained donations for USC's water-polo account—the legal theory that *Abdelaziz* rejected—*or* that Vavic obtained scholarships for his sons, without specifying which. Where "one of the possible bases of conviction was legally erroneous," the verdict must be set aside. *United States v. Nieves-Burgos*, 62 F.3d 431, 436 (1st Cir. 1995).

1. As the government acknowledged below, if "a legal theory is set aside on appeal and the First Circuit cannot decide what … the jury found, then it automatically gets remanded." JA4.712. This Court routinely "set[s] aside" verdicts in honest-services fraud and federal-programs bribery cases because "a particular theory of conviction submitted" to the jury was "contrary to law" and "it is impossible to tell which ground the jury selected." *Abdelaziz*, 68 F.4th at 65 (citation omitted) (citing cases).

For instance, if the jury verdict did not specify which ground among many the jury chose, and one is legally invalid, vacatur follows. *E.g.*, *United States v. Fernandez*, 722 F.3d 1, 33 (1st Cir. 2013) (jury did not specify whether racketeering predicate was federal bribery or invalid theory under repealed Puerto Rico statutes). And vacatur follows if the jury instructions let the jury pick among multiple bases for conviction, one of which was legally wrong. *United States v. Sawyer*, 85 F.3d 713, 730-31 (1st Cir. 1996). So long as it is

"possible that the jury focused its verdict on [an] erroneous basis," vacatur follows. *Id.* at 731.

By those metrics, this is not a close case. Count 16 charged Coach Vavic with honest-services fraud based on a January 2019 call that Singer—then the government's agent—made to Vavic. The government claimed that call commemorated a pre-existing scheme. JA5.73-74. But Count 16 did not require the jury to specify whether that supposed scheme involved depriving USC of honest services in exchange for scholarships for Vavic's sons, donations to USC water polo, or both. And, because the court overruled Vavic's objections that university donations cannot establish honest-services fraud, both theories went to the jury as possible bases for conviction on Count 16.[8]

As the district court observed: "[T]he jury may have found a bribe or kickback based not on the tuition payments for Vavic's children but on the funds paid to the USC Water Polo gift account." G.Add.39. *Abdelaziz* validated Vavic's objection, but it is too late to unscramble the verdict. The indictment grouped Counts 8-16 together, charged multiple defendants with making calls and emails for "for the purpose of executing the scheme to defraud,"

---

[8] *See* Dkt. 608 at 3-4; Dkt. 1057 at 92-93; Dkt. 1085 at 17-18; Dkt. 1386 at 1-3; JA4.642-43; JA5.788-89.

JA1.106, and defined the "scheme to defraud" as involving donations to universities plus other payments. JA1.76-77; *accord* JA1.89 (same interchangeable references to USC donations and scholarships as to Vavic).

The jury instructions and verdict form likewise allowed the jury to convict on either basis. As to Count 16, the district court informed the jury that Vavic "is accused of committing this crime by engaging in a fraudulent scheme to deprive USC of its right to [] honest services." JA5.272. To define honest-services fraud, the court referred back to its instructions for the Count 2 honest-services conspiracy charge, JA5.272, which told the jury it could convict *either* based on "[p]ayment made to a university," *or* a "personal" payment. JA5.264-65. Consistent with those instructions, the verdict form merely asked the jury to select "Not Guilty" or "Guilty" "[a]s to Count Sixteen, the charge of honest services wire fraud." Supp.A.153.

The government then urged conviction on all counts *solely* based on evidence involving donations to USC. *E.g.*, JA5.71, 214. The government in closing argued: "[T]he defense wants you to focus on the fact that this money went to USC and not to the defendant personally, but what matters is what the money was for. Here, this money was in exchange for getting the defendant

to stage a fake recruitment, … That's honest services fraud … even though the money went to a USC account." JA5.60; *accord* JA5.51-52.

During rebuttal, the government replayed back-to-back the 2018 Singer-Vavic call about Huneeus and the January 2019 call upon which Count 16 rests, then stated: "In these two calls, the defendant could hardly be more clear. *In exchange for the payments to his program and the tuition for his sons*, he would aid Singer's scheme in whatever way he could. It didn't matter where Singer sent the money, whether to his water polo program or to his kids' high school." JA5.74 (emphasis added). That comported with the government's theory throughout trial that Vavic purportedly sought a *quid pro quo* for each of the three students the government claimed were improperly admitted, and refutes the government's late-breaking claim (at 69-70) that Vavic was supposedly in Singer's pocket forever based on his sons' scholarships.

The district court thus rejected the government's later contention that "the argument to the jury was, put the money to the program aside." JA5.785. The court responded: "No, it wasn't. It was hammered on the rebuttal … it doesn't matter if it gets to the program." JA5.785; *see* G.Add.38-39.

2.  Having made that strategic choice, the government cannot preserve any honest-services fraud convictions after *Abdelaziz*—a decision the government scarcely mentions.  Govt Br. 30 n.12, 61.  In the context of discussing prejudice from improper closing arguments, the government (at 68-70) argues that the jury must have convicted on Count 16 based on the scholarships because the January 2019 call only discussed the scholarships.  That is the wrong inquiry here (and a questionable take on the call regardless).  When a general verdict could rest on multiple theories and one is legally erroneous, the question is whether it is possible to tell which ground the jury picked.  *Abdelaziz*, 68 F.4th at 65; *contra* Govt Br. 68 n.17.  Here, it is anyone's guess which theory the jury picked, so vacatur is "automatic[]," JA4.712, even if (unlike here) overwhelming evidence supported another ground.  *See Sawyer*, 85 F.3d at 731.

Of course, the evidence was manifestly insufficient to convict on either theory—an argument that Vavic preserves for further review if necessary.  But, at a minimum, the new-trial order was correct.  The government urged the jury to convict based on a legally erroneous theory involving USC donations alone, yet now denies that the jury might have taken the government at its word.  This Court should not reward that about-face.

### III. The Government's Reliance on False Statements in Closing Arguments and Throughout Trial Warrants a New Trial

Ruling before *Abdelaziz*, the district court correctly ordered a new trial on other grounds. Just as Singer was the hub of the alleged conspiracy, Singer was the hub of the government's case. But Singer was a prolific liar, and the government knew it. Instead of calling Singer to testify, the government introduced Singer's devastating falsehoods about Vavic through out-of-court statements. Then, in closing, the government replayed those lies and urged the jury to take Singer's words for their truth. Further, the government's rebuttal repeatedly misrepresented evidence regarding Vavic's supposed agreement with Singer to recruit Agustina Huneeus—then urged the jury to convict based on that alone. G.Add.40-41; JA5.227. The district court rightly recognized that these tactics created "a substantial risk that the jury reached a decision based on false evidence." G.Add.40-41. Ordering a new trial based on the cumulative, prejudicial effect of flooding the jury with false statements was essential to preserve the integrity of the judicial process, not an abuse of discretion.

### A. The Government's Prolific Reliance on Singer's False Statements Warrants a New Trial

1.  To state the obvious, the government cannot obtain convictions by knowingly introducing false evidence. *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *United States v. Vega*, 813 F.3d 386 (1st Cir. 2016). If the government elicits "false testimony" and "knew or should have known it was false," a new trial follows if there is "a likelihood that the false testimony affected the judgment of the jury." *United States v. Freeman*, 650 F.3d 673, 678 (7th Cir. 2011); *accord Dow v. Virga*, 729 F.3d 1041, 1046-49 (9th Cir. 2013); *Jenkins v. Artuz*, 294 F.3d 284, 294-95 (2d Cir. 2002); *United States v. LaPage*, 231 F.3d 488, 491-92 (9th Cir. 2000). "'[H]alf-truths' and vague statements that could be true in a limited, literal sense but give a false impression to the jury" are equally forbidden. *Freeman*, 650 F.3d at 680; *see United States v. Vozzella*, 124 F.3d 389, 393 (2d Cir. 1997). And Rule 403 independently bars admission of unduly prejudicial evidence. *Abdelaziz*, 68 F.4th at 57; *supra* pp. 54-56.

Thus, when the government elicits false evidence, courts apply a "diminished burden" and merely ask whether false testimony might likely have influenced the jury. *Freeman*, 650 F.3d at 681 (collecting cases); *accord Dow*, 729 F.3d at 1048-49. And when, as here, district courts determine that false statements or testimony lacking credibility may have influenced the jury, courts of

appeals defer to the district court's experience in the courtroom. *Freeman*, 650 F.3d at 681; *accord United States v. Stacks*, 821 F.3d 1038, 1045-46 (8th Cir. 2016). Such cases are rare—but when they arise, courts zealously hold prosecutors to their special duty to ensure that juries use facts, not speculation, to convict defendants. *Freeman*, 650 F.3d at 683-84; *see also Vozzella*, 124 F.3d at 392-93.

Take *Freeman*, where the Seventh Circuit agreed a new trial was warranted after the government elicited false witness testimony about a co-conspirator. 650 F.3d at 677. Part of that testimony—that the co-conspirator was present—was false; he was in prison at the relevant times, and that revelation tainted the rest of the testimony. *Id.* The Seventh Circuit held that unacceptable prejudice remained even though cross-examination impugned the testimony, the government later stipulated that the witness's testimony was false, and there was "very strong" other evidence of guilt. *Id.* at 677-78, 681. Because this testimony supplied "necessary details that gave flesh and context" and was not "mere surplusage," the conviction was vacated. *Id.* at 682; *accord Jenkins*, 294 F.3d at 293-94 (government's failure to correct testimony that was "probably true but surely misleading" warranted habeas relief).

2.  If any case warrants a new trial due to pervasive false statements, this is it.  Singer was the linchpin among disparate parents, coaches, and administrators.  G.Add.9-10.  The government used Singer as its agent to incriminate parents and coaches beginning in September 2018.  JA2.466-68.  Yet the government refused to call Singer as a witness.  Indeed, when confronted with Singer's contemporaneous notes complaining that government agents "continue to ask me to tell a fib" and "ask[] me to bend the truth" to "entrap" parents, the government's investigative agent called Singer a liar.  JA2.481, 487, 586, 592-93.

At the same time, the government "insist[ed] on putting [Singer's] words to the jury as the truth," as the district court noted.  JA5.327.  The court voiced concerns that "every single call" by Singer contained "lies."  JA2.246.  Before trial, the court asked the government: "[A]s an officer of the Court … [i]f you knew that the statements are false and you get them in in front of a jury because they're co-conspirator statements, wouldn't you agree … those should be excluded" based on "the prejudicial value."  Supp.A.107.  The government replied:  "I don't think there's necessarily a problem."  Supp.A.108.  At trial, when the court asked again, JA1.126, the government doubled down:  "[I]t's

simply not true to say that [the government] can't put in evidence that [it] will ultimately demonstrate is false." JA1.139; *see* JA1.129 (similar).

The court expressed recurrent concern that "if Singer is saying that Vavic is doing certain things, and you know that is false, to put that in front of the jury seems to me to be intentionally misleading the jury." JA2.238; *accord* JA2.196; JA5.292 (similar). Yet the court overruled defense counsel's continuing objections to introducing this false testimony at all.[9]

Instead of exposing Singer to cross-examination, the government presented the jury with numerous false statements that Singer made in emails, on recorded calls, and to other witnesses:

- When parent Agustin Huneeus asked "why" Vavic would support Agustina's application, Singer claimed: "I have actually helped all of [Vavic's] kids get in to college all over the country … [a]t no cost to him." JA5.615. None of this was true, G.Add.27 n.9, as the government conceded, JA2.265-66.

- When Huneeus asked where his donations would go, Singer replied: "[W]hat [Vavic] usually does is I subsidize his staffs' salaries … I put two of his staff members on my books as contractors" and "pay them … additional salary." Singer further claimed that for a "certain percentage," Coach Vavic sent Singer "invoice[s]" for $100,000 to cover team travel costs. JA5.618. Those claims were false, and "[c]ontrary to all other evidence in the record." G.Add.40; *accord* JA2.269.

---

[9] *E.g.*, JA1.137-39, 123, 631-36, 721; JA2.72, 184-85, 264, 512, 522; JA4.537-38; Dkt. 1278 at 44 & n.29.

- Singer told Yale coach Meredith that Vavic gave him "a spot on the boys side and a spot on the girls side" each year. JA1.739-40; JA5.566. "[N]o corroborating evidence" supported this claim. Supp.A.150.

- Singer boasted to Meredith of doing side deals at "Harvard, Stanford, Princeton, USC a ton, Northwestern, Michigan, we've done it everywhere," totaling "seven hundred and sixty" side door deals in 2018 and 690 "the year before." JA5.563-65.

- The jury heard Singer's boasts to have "three spots at Stanford every year," JA5.566, "four spots at Georgetown," JA5.569, and to have "done it at Duke too, with Coach Krzyzewski, and Coach Capel." JA5.564.

No evidence substantiated any of this. To mitigate the obvious problems from deluging the jury with Singer's lies, the court asked the government to "immediate[ly] ... address" statements which the government knew to be false. JA2.250. The government addressed only some, like Singer's lies about subsidizing Vavic's staff, paying for team travel, and getting Vavic's children into college. *See* JA2.265-69; Govt Br. 75-76.

Even then, the government just asked case agents with no knowledge of the full record whether they had seen "any evidence to suggest" particular statements were true, to which those witnesses replied, "[n]o" or "I have not." JA2.265, 269. Likewise, the government allowed the jury to hear many Singer lies by playing a call with Meredith, then merely had Meredith confirm that he personally did not know whether these statements were "true or an exaggeration," JA1.739, or that he personally disbelieved some, JA1.737; *accord*

JA1.778-79. The government introduced other fabrications without qualification, including that Vavic supposedly gave Singer "a spot" on the men's and women's teams every year. *E.g.*, JA1.740; JA5.566.[10]

The jury instructions worsened the problem. As noted, at the close of evidence, the court held that *all* co-conspirator hearsay from 2013 on could be considered for its truth. Supp.A.151-52 (*Petrozziello* ruling); JA4.483-506 (defense objections). The court thus instructed the jury it could "consider" *all* post-2013 Singer "statements for the truth of the matters asserted," JA5.249—meaning that even Singer's lies could be taken for truth.

The government's closing and rebuttal then repeatedly "offered Rick Singer's words for the truth of the matter asserted," as the district court observed. JA5.288. The government (at JA5.70) replayed the call where Singer lied that Vavic was "my guy" because Singer (1) helped get all of Vavic's kids into various colleges, (2) subsidized Vavic's staff salaries, (3) paid invoices from Vavic to cover team travel costs, and (4) had worked with Vavic since 2006.

_____

[10] The government (at 75 n.19) claims the defense invited error by agreeing to admit these false statements and asking for real-time corrections. That was merely the third-best option after the court rejected defense objections to exclude all of Singer's statements, JA1.137-38, and for the court to instruct the jury after each concededly false statement. JA1.138; JA2.250.

JA5.614-15, 618. And the government (at JA5.48) replayed the call where Singer lied that Vavic gave him "a spot on the boys side and a spot on the girls side" every year. JA5.556.

Yet "the government made no disclaimer or acknowledgement to the jury that it was not offering Singer's statements about Vavic for their truth." G.Add.41. Instead, the government insisted: "When Huneeus asks why Vavic would support his daughter's application … Singer tells him, 'Because he's my guy.' And *you know that's true*." JA5.70 (emphasis added). The government also portrayed this call as where Singer "could not have been more explicit … about how the scheme worked." JA5.237. And the government portrayed Singer's statements writ large as "corroboration"—a remarkable claim when witnesses just parroted false statements that Singer had told them. JA1.322, 739-40; JA2.780; JA5.219-20. As the district court recognized: "Although the government said numerous times in your closing that you don't have to believe Rick Singer, you have offered Rick Singer's words for the truth of the matter asserted." JA5.288.

3. Confronted with a trial riddled with false statements that the government offered as supposed proof, the district court found "a substantial risk that the jury reached a decision based on false evidence." G.Add.41. That was

no abuse of discretion, especially given the deference reviewing courts give to district courts' bird's-eye view of trial. *Freeman*, 650 F.3d at 681-82. The idea that Singer's falsehoods "did not contribute to the verdict" beggars belief. *See United States v. Fulmer*, 108 F.3d 1486, 1498 (1st Cir. 1997) (citation omitted).

As the hub of the admissions scheme and the only person aware of the spokes, Singer's false statements inherently carried great weight. The government force-multiplied their effect by introducing this evidence through out-of-court statements, so the defense had no chance to confront Singer.[11] *See United States v. Demott*, 906 F.3d 231, 248-49 (2d Cir. 2018) (considering a lack of cross-examination highly prejudicial, even in the face of "ample additional evidence"). And Singer's false statements pervaded the trial—another sign of prejudice. *See Canty*, 37 F.4th at 792. The jury heard variations of Singer's fabrication that Vavic gave Singer an annual "spot on the boys side and a spot on the girls side" at least five times. JA1.740; JA2.73, 303-04; JA5.54, 566. The jury heard Singer's false claims of subsidizing Vavic's staff

---

[11] Singer's attorney made it clear that Singer "would not be available" to meet with defense counsel, JA5.290, and the court considered Singer a missing witness in the government's control, JA5.285-90, 326-27.

salaries and getting Vavic's children into college three times.  JA2.269; JA4.238; JA5.618; Supp.A.158.

Further, Singer's false statements supplied "flesh and context to the government's evidence." *See Freeman*, 650 F.3d at 682.  Singer's statements uniquely addressed what Vavic supposedly received in return for helping Singer (supposed answer: subsidies for his team staff and the ability to invoice Singer for the team's foreign travel, JA5.618).  And Singer's falsehoods were incredibly prejudicial; they falsely painted Vavic as guaranteeing Singer spots and captive to Singer's asks regardless of recruits' credentials.  Having urged the jury to heed Singer's words, JA5.48, the government cannot plausibly claim the verdict was untainted by his falsehoods.

4.  The government offers scant response on this independent ground for vacatur.  The government (at 74) admits that Singer's statements about subsidizing Vavic's staff salaries, paying team travel invoices, and getting Vavic's children into college were "false."  Yet the government (at 74) astonishingly dismisses them as "not false in any way meaningful to the jury's assessment of Vavic's guilt."  But the government's obligation is to avoid presenting falsehoods, "half-truths," and misimpressions—not just to avoid "meaningful" lies. *Freeman*, 650 F.3d at 680.

Nor were these lies mere "difference[s] in details," *contra* Govt Br. 74, or confined to allegations about recruitments in exchange for USC donations, *contra* Govt Br. 77. These lies went to the government's theory of motive—why the government claimed the jury should believe Vavic was Singer's "guy." Based on the actual evidence, the best the government could argue was that Vavic was Singer's "guy" based on Wilson's $100,000 donation to USC and the high-school scholarships—and that evidence was, as noted, problematic. *Supra* pp. 12-13, 20. But when a parent asked why Vavic was Singer's "guy," Singer invented subsidies for Vavic's staff salaries, team travel payments, and getting Vavic's children into college—payoffs that insinuated that Singer effectively controlled Vavic's team. In rebuttal, the government embraced these known falsehoods and argued that this very call was where Singer supposedly supplied slam-dunk proof of "how the scheme worked." JA5.236-37, 618.

The government (at 75-77) touts its earlier efforts to call out Singer's falsehoods, and faults the district court for omitting them. But the government offered no "disclaimer[s]" when deploying Singer's falsehoods in closing, G.Add.41, instead "offer[ing] Rick Singer's words for the truth of the matter asserted," JA5.288. Whatever curative effect the government's efforts had

nineteen days earlier—when the government first elicited Singer's statements—was undone.

Indeed, the Seventh Circuit rejected the curative effect of an end-of-trial *stipulation* that testimony was false, citing concern that the intervening twelve days between the false testimony and the stipulation, as well as the "tedious[ness]" of the five-week trial, dissipated the effect. *Freeman*, 650 F.3d at 681. This case is clearer than *Freeman*, where the disclaimer followed the false evidence. The government flagged only some of Singer's falsehoods as they transpired. *Supra* p. 68. Weeks later, the government brandished multiple false statements in closing without disclaimers. Then the jury instructions invited the jury to take Singer's false statements for their truth.

Finally, the government (at 38, 74) lobs a process foul, contending that the district court raised *sua sponte* "[t]he *Petrozziello*-related issue"—i.e., the false Singer statements admitted into evidence as permissible co-conspirator hearsay. And the government (at 38) faults Vavic for supposedly never raising the "synergy" between the admission of Singer's false statements and the government's replay of those misstatements during summation.

But the record is replete with defense objections that introducing Singer's false statements risked giving the jury "a false impression." *Supra*

p. 66 n.9.  The district court rejected those objections, plus defense objections to admitting co-conspirator hearsay.  JA1.636, 648, 721; JA2.72, 264, 272. When, as here, the "trial court devoted considerable attention to the contested evidence throughout the trial, fielding repeated objections," those objections encompass "the prosecution's arguments from that evidence," even if the defendant "did not specifically object before jury deliberations." *Carpenter*, 494 F.3d at 20.  Further, the defense raised the severely prejudicial effect of these false statements in post-trial briefing.  Dkt. 1278 at 44-47.

### B.  The Government's Misrepresentations in Closing Arguments Compounded the Prejudice

Were more needed, the government's factual misstatements in rebuttal compounded the prejudicial effects of Singer's false statements, as the district court found.  G.Add.40-41.  "It is misconduct for a prosecutor to make an assertion to the jury of a fact … unless there is evidence of that fact."  3 Charles Alan Wright, Nancy J. King & Susan Klein, *Federal Practice and Procedure* § 588 (5th ed. 2019).  And "prejudicial statements made during closing argument militate in favor of reversal because they are the last words spoken to the jury by the trial attorneys." *United States v. Azubike*, 504 F.3d 30, 39 (1st Cir. 2007) (internal quotation marks omitted).  This Court has accordingly ordered new trials based solely on prosecutors' misstatements of evidence in

closing, when the misstatement "poisoned the well" enough to likely affect the outcome. *Id.*; *accord United States v. Ayala-García*, 574 F.3d 5, 16-17 (1st Cir. 2009). That is true even under plain-error review of these closing statements. *Canty*, 37 F.4th at 791; *Arrieta-Agressot v. United States*, 3 F.3d 525, 528 (1st Cir. 1993).

Here, the government falsely claimed six times that Vavic agreed to recruit an unknown student (Agustina Huneeus) "for $100,000." JA5.62, 210, 211, 227-28, 237-38. But "the assertion that the agreement [to recruit Huneeus] was for $100,000 was not supported by any evidence." G.Add.40. And, again, Vavic undisputedly never recruited Huneeus nor received donations in exchange. Govt Br. 15-18; JA5.647-65; *supra* p. 21.

The government (at 72) claims it was reasonable to infer that any agreement to recruit Huneeus was for $100,000 because Vavic mentioned a $100,000 "fundraising shortfall" for his program budget. JA5.597. That inference is pure *ipse dixit*. There is no reason why a parent would necessarily donate $100,000; the government pointed to donations for lesser amounts, like Feiwell's $50,000, JA1.234; JA5.67. If Vavic had a $1.2 million shortfall, it would not follow that any recruitment was for $1.2 million. Such an inference in no way resembles, say, inferring that a defendant was a "high-volume seller"

based on his storage of massive amounts of heroin in his kitchen. *Cf. United States v. Perez Soto*, 80 F.4th 50, 59 (1st Cir. 2023) (cited in Govt Br. 72-73).

Nor was this misstatement innocuous. By insisting that Vavic agreed to recruit an unknown student "for $100,000," the government misleadingly conjured a large, highly specific sum to firm up a supposed *quid pro quo*. That was especially damaging because, on the call, Vavic merely told Singer to send a resume and other materials after hearing that the recruit was a wealthy water-polo player from water-polo powerhouse Marin Academy with a good GPA (which Singer lied about, JA5.600; *cf.* JA5.648). Vavic even pressed on her credentials (including if she attended "[Vavic's] camp" to train promising high-school players). JA5.599, 601, 604.

The district court rightly considered these repeat misrepresentations highly prejudicial alongside Singer's repeat falsehoods. G.Add.39-41. Especially given that broader context, the boilerplate jury instructions that argument is not evidence did not cure the prejudice. And, if anything, the jury's access to the calls themselves compounded the prejudice; the jury would just rehear the lies without any disclaimers. *Contra* Govt Br. 73-74. This case thus bears no resemblance to situations where courts gave curative instructions

specifically directing the jury to re-read a transcript the government misde-scribed. *United States v. Pires*, 642 F.3d 1, 15 (1st Cir. 2011). Likewise, ge-neric argument-is-not-evidence instructions do not negate "severe or perva-sive" misstatements, such as the raft of false statements and government mis-statements here. *See Canty*, 37 F.4th at 792; *Azubike*, 504 F.3d at 41-42; *United States v. Sandoval*, 6 F.4th 63, 97 (1st Cir. 2021).

## IV.    The District Court Did Not Abuse Its Discretion in Holding That Prosecutors' Rebuttal Misled the Jury on the Instructions

The district court also granted a new trial based on misstatements of law in the government's rebuttal. As discussed, the government repeatedly ac-cused Coach Vavic of seeking donations to USC's water-polo team in exchange for facilitating the admission of students as water-polo recruits. *Supra* p. 60. The agreed-upon jury instructions required the government to prove that such donations were "contrary to the university's interest" to obtain convictions for either honest-services fraud or federal-programs bribery. *See* Govt Br. 62-63. At the jury charge conference, the court rejected the government's argument that if Vavic made misrepresentations about recruits, that alone showed that parents' donations to USC were contrary to USC's interest. JA4.657-64. The next day, the government turned around and told the jury at least four times to convict on that theory. JA5.214, 233-34, 227-28. The court did not abuse its

discretion in holding that these statements "flatly ignored" its instructions and "so poisoned the well" that a new trial was needed.  G.Add.37-39.

## A.    The Government Contravened the Jury Instructions

1.  When the government misstates the court's instructions as to questions of law in ways that mislead or confuse the jury, vacatur ordinarily follows. *United States v. Velazquez*, 1 F.4th 1132, 1136-37 (9th Cir. 2021).  Even under plain-error review, the court's description of the government's closing as "flatly ignor[ing] the court's instruction" identified a clear and obvious error. G.Add.39.

Begin with the court's instructions.  Both honest-services fraud and federal-programs bribery require defendants to have intended to accept or receive *quid pro quo* bribes or kickbacks.  *See Abdelaziz*, 68 F.4th at 21-22, 28; *Skilling v. United States*, 561 U.S. 358, 408-09 (2010); 18 U.S.C. § 666(a)(1)(B). Here, the parties agreed that both offenses required showing a quid pro quo bribe made with "corrupt intent," and that these concepts meant the same thing for both honest-services fraud and federal-programs bribery.  JA4.690-93; *but see Abdelaziz*, 68 F.4th at 21-22, 26-27 (later holding that bribery has a broader meaning under § 666 than under § 1346 for honest-services fraud).

Accordingly, the court gave cross-cutting instructions that "[f]or bribery, there must be a specific intent to give or receive *something of value* with the *corrupt intent of inducing the employee … to act in his or her … own interests instead of the employer's interests*." JA5.264 (emphases added); *see* JA5.272. Further, the court instructed, "[p]ayment made to a university … may constitute a thing of value to the employee … only" if (as relevant here) "payments are made for the employee's own interests *and receipt of the payments is contrary to the university's interest*." JA5.265 (emphasis added).

Thus, the jury instructions required the government to prove that donations to USC were contrary to USC's interests to obtain any convictions based on such donations. *Accord* Govt Br. 62-63. During the jury charge conference, the court clarified that the government could not prove that those donations were contrary to USC's interests simply because Vavic purportedly made misrepresentations. JA4.657-58. Instead, "there has to be a deprivation" for USC and "they have to profit less or they have to get less." JA4.662-64. Because honest-services fraud independently requires a misrepresentation, counting misrepresentations as inherently contrary to an employer's interest would collapse distinct inquiries. JA4.662. And not every misrepresentation to an employer makes the employer "worse off," JA4.635, or evinces corrupt intent.

"Corruptly" accepting bribes under 18 U.S.C. § 666 requires more than an abstract bad intent or violation of employer policies. *Cf. Snyder v. United States*, No. 23-108 (U.S.) (implicating the meaning of "corruptly"). (Vavic also preserves for further review the argument that § 666 does not encompass alleged bribes that entail payments to the alleged victim—here, USC—but recognizes that *Abdelaziz* rejected that interpretation).

2. The government's rebuttal then pressed the jury to convict just by finding that Vavic made misrepresentations to USC—or even that just accepting donations alone under the circumstances was contrary to USC's interests:

- "If you conclude that Jovan Vavic lied … and misled USC to benefit his own program financially … you can convict him for that alone." JA5.214.

- "[Y]ou know that when he was taking money to the water polo team in exchange for recruiting Johnny Wilson and when he agreed to take money to the water polo team to recruit Agustina Huneeus, he was acting contrary to the university's interests." JA5.234.

- "He was acting for his team and his interests and not for the university's interests when he took money to his team. He didn't want it to go to … the rest of the university." JA5.234.

- "[T]hat call [between Singer and Vavic] by itself" about Huneeus "is enough to convict him … He doesn't even know anything about her, except that she's not really going to play water polo and that her parents are going to give him $100,000 for his team." JA5.227-28.

- "If a math professor sells an A plus to a student who deserves a D and lies to the registrar about it and puts the money in the math department fund, that's honest services fraud." JA5.233.

As the district court held, these statements "flatly ignored" the court's instructions. G.Add.39. The closing statements "conflated a payment to the USC Water Polo team with a payment to Vavic," G.Add.39, making it seem as though donations to USC's water-polo program—which Vavic concededly never misappropriated, G.Add.16—were inherently suspect.

Moreover, these statements misleadingly suggested that, despite receiving hundreds of thousands in donations from parents that USC has never disgorged, those donations were necessarily contrary to USC's interests because Vavic allegedly misrepresented students' athletic prowess. G.Add.39; JA4.657-58, 662-64. But not all misrepresentations are per se contrary to the university's interests. *E.g.*, JA4.635. Employers may tacitly or implicitly permit some misrepresentations—including about the source of donations—particularly when they benefit the employer's bottom line. JA4.635-36, 661-62.

The government (at 52) argues that defense counsel knew that misstatements were per se contrary to USC's interests because counsel denied that Vavic made any misstatements. That argument just reduces to the impermissible proposition that any misrepresentations would be contrary to USC's interests. Vavic in no way conceded that misrepresentations alone were legally

sufficient merely by pointing out the insufficiency of the evidence that he knowingly misrepresented recruits at all.[12]

3.  The government does not challenge the jury instructions as legally incorrect.  Instead, the government (at 62-63) claims to have shown that misrepresentations were contrary to USC's interests because USC would not have approved of "the scheme" had it known.  But the government's burden was to show that the *receipt of the payment* was contrary to USC's interest, not that a broader alleged scheme would harm USC.  JA5.265.  The fact that USC fired Vavic does not show this; USC terminated Vavic hours after hearing of his arrest, before completing an internal investigation.  *Cf.* JA5.231-35.

The government (at 51-52, 66) claims the court's instructions comported with its theory that misrepresentations alone show that donations are contrary to the university's interests.  But by the jury charge, the court clearly identified deception as a "separate element" from the "contrary to interest" require-

---

[12] The government (at 52) takes statements out of context in arguing that counsel knew that misstatements were per se contrary to USC's interests.  Defense counsel said "I've got a problem" if the jury believed Khosroshahin's testimony insofar as Khosroshahin was claiming that Vavic conspired with Singer before 2009.  JA5.94.  That did not bear on the underlying bribery offense.

ment.  JA4.662.  As the court put it: "[Y]ou have a different situation" if employees lie to employers in ways that do not make the university "worse off." JA4.635.  Likewise, the court explained that "USC's interest is as it defines its interest," JA4.622, to make the point that universities might be silent about certain types of misrepresentations—leaving open whether the misrepresentations go against the university's interests.  JA4.635-36, 647-48, 659, 661-65.

The government (at 62-64) accuses the district court of rewriting the jury instructions to "require[]" proof of "tangible harm" to USC.  But the court rejected defense instructions requiring such proof, Govt Br. 63, and its opinion did not reverse course.  Nor did the court misinterpret the government as urging the jury to "convict without regard to whether receipt of the payment was contrary to USC's interests."  *Contra* Govt Br. 66.  The court cited the lack of evidence "that USC received less money through the side-door than it would have through VIP admissions, that Vavic misused funds in the USC account, or that USC returned the money once the scheme was revealed" as illustrative examples of how the government could have—but did not—show that donations were contrary to USC's interests.  Govt Br. 62; *see* G.Add.39.

Finally, the government (at 49-50) downplays two rebuttal statements as clarifying that the jury could convict Vavic based on any instance of corruptly facilitating an admission. But the basis the government urged was that "misle[ading] USC" about recruits "to benefit [Vavic's] own program financially" was enough to convict. JA5.214; *accord* JA5.227-28.

### B. The Government's Misstatements Were Prejudicial

Improper closing arguments warrant a new trial if they "poisoned the well" based on their severity, surrounding context, the effect of any curative instructions, and the strength of the government's case. *Carpenter*, 494 F.3d at 23. The bottom-line question is "whether the prosecutor's improper comments have undermined the fairness of the trial." *Id.* This Court affords "substantial deference" to the trial judge, who is more "conversant with the factors relevant to the determination than any reviewing court can possibly be." *Id.* at 24 (citation omitted); *United States v. Baptiste*, 8 F.4th 30, 35 (1st Cir. 2021) (cleaned up).

Here, the district court focused on the severity of the offense: the government "flatly ignored [] the court's instruction." G.Add.39. Deliberate misstatements favor a new trial more than accidents. *See Canty*, 37 F.4th at 791-92. Those misstatements recurred four times, G.Add.37-38, and improper

statements "built over a considerable portion of [the government's] rebuttal" support a new trial. *Canty*, 37 F.4th at 792. The prejudice grows when, as here, no curative instructions were given. The government deems sufficient the court's general admonitions to follow the jury instructions and that counsel's arguments are not evidence. But such boilerplate does not ordinarily solve the prejudice from repeat statements. *Id.* at 792-93.

Moreover, the strength of the government's case was hardly "overwhelming." *Contra* Govt Br. 67. The government is not even appealing a new trial on Count 2.[13] *Abdelaziz* impugns the government's attempts to prove the charged, sprawling conspiracy. *Supra* pp. 36-47. The jury was told it could convict on all honest-services counts just based on donations to USC—the theory *Abdelaziz* forecloses. *Supra* p. 59-60. The district court ordered a new trial because so much of the government's case and closing argument rested on Singer's false statements. Other co-conspirator hearsay never should have come in. *Supra* pp. 51-54. And these fatal flaws go to the heart of the evidence

---

[13] The court denied Vavic's Rule 29 motion for acquittal by asking whether the jury could have convicted on *any* theory, and holding that his sons' scholarships alone could have sufficed. G.Add.35-36. That does not address whether trial errors "so poisoned the well" that the trial's outcome was likely affected. *Canty*, 37 F.4th at 796.

of culpability and guilty knowledge on all counts; the government cannot be-latedly segregate from the rest of the case supposedly "overwhelming" evidence that "Vavic agreed to recruit unqualified athletes in exchange" for scholarships for his sons. *Contra* Govt Br. 68-69.

Regardless, the government's only example of a supposed recruitment in exchange for the scholarships was Feiwell. As to her, there was substantial evidence that Vavic believed she was qualified. The evidence was undisputed that Feiwell played high-school water polo, JA3.377; that Singer employee Janke—not Vavic—falsified Feiwell's credentials before Vavic saw them, JA4.121; that Feiwell's position, goalie, was much-needed, JA3.585-87; and that, upon meeting Feiwell, Vavic asked her to jump in the pool and block shots, yet she refused, JA4.115.

Evidence of a *quid pro quo* was also lacking. The government seized on proximity between Feiwell's admission and Singer's offer of scholarships to the Vavics. But the evidence was undisputed that USC administrator Heinel—not Vavic—arranged for Feiwell's admission and received a $50,000 donation from Feiwell's father. JA3.64-65; JA5.554-55, 676. Further, Singer held his nonprofit out as granting thousands of scholarships, JA5.597, and the

Vavics consulted USC's ethics officer about the scholarships—not scrutiny one would invite of bribes.  JA5.521-22.

Finally, the government (at 46, 65, 68-71) reiterates that plain-error review applies and required the district court to find a reasonable probability of a different outcome.  But the plain-error inquiry into whether the error "affected the defendant's substantial rights" and "seriously impaired the fairness, integrity, or public reputation of judicial proceedings" collapses into the poison-the-well inquiry for closing-argument errors.  *See Canty*, 37 F.4th at 790 (citations omitted).  Both tests "ask whether it is likely that the misconduct affected the trial's outcome."  *Id.* at 791.  The district court applied the right standard, G.Add.37, 39, and—having watched this trial unfold—rightly ordered a new trial.

*     *     *

A new trial is warranted several times over.  This Court's intervening decision in *Abdelaziz* makes clear that the conspiracy convictions and honest-services fraud convictions are legally unsound.  The government does not even appeal on Count 2.  Even before *Abdelaziz*, a new trial was so clearly justified that the district court identified two independent grounds that merit "substan-

tial deference." *Baptiste*, 8 F.4th at 35 (cleaned up). The government overwhelmed the jury with false and misleading statements from the ringleader—Singer—who never appeared in front of the jury, and urged the jury to take those lies as truth in the government's closing. And the government misrepresented both facts and the law in closing argument. Faced with tactics that took the trial off the rails, the district court did not abuse its discretion in ordering a new trial. The only question is why the government continues to pursue a prosecution so riddled with flaws.

## CONCLUSION

The judgment of the district court should be affirmed.

Respectfully submitted,

SARAH M. HARRIS
KATHERINE A. TREFZ
ASHWIN G. SHANDILYA
JEFFREY G. HO
WILLIAMS & CONNOLLY, LLP
  *680 Maine Avenue, S.W.*
  *Washington, DC 20024*
  *(202) 434-5000*
  *sharris@wc.com*

*Counsel for Defendant-Appellee*
*Jovan Vavic*

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND WORD-COUNT LIMITATIONS

I, Sarah M. Harris, counsel for defendant-appellee Jovan Vavic, and a member of the Bar of this Court, certify, pursuant to Federal Rule of Appellate Procedure 32(g), that the attached Answering Brief of Defendant-Appellee Jovan Vavic is proportionately spaced, has a typeface of 14 points, and contains 18,059 words.

/s/ *Sarah M. Harris*
SARAH M. HARRIS

JUNE 24, 2024

**CERTIFICATE OF SERVICE**

I, Sarah M. Harris, counsel for defendant-appellee Jovan Vavic, certify that, on June 24, 2024, a copy of the attached Answering Brief of Defendant-Appellee Jovan Vavic, was filed with the Clerk and served on the parties through the Court's electronic filing system. I further certify that all parties required to be served have been served.


/s/ *Sarah M. Harris*
S￼ARAH M. H￼ARRIS